**PUBLISH**

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

_____

Nos. 95-4099 and 95-4596

_____

D.C. Docket No. 94-322-CR-JM

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
09/23/98
THOMAS  K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANIEL J. FERN,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(September 23, 1998)**

On Petition for Rehearing

Before HATCHETT, Chief Judge, COX, Circuit Judge, and MESKILL[*], Senior Circuit Judge.

_____

[*] Honorable Thomas J. Meskill, Senior U.S. Circuit Judge for the Second Circuit, sitting by designation.

HATCHETT, Chief Judge:

Upon motion for reconsideration, the prior panel opinion, reported at 117 F.3d 1298, is withdrawn, and the following opinion is substituted in its stead.

In this consolidated appeal, we affirm the convictions of Daniel Fern for mail fraud, attempted witness tampering and violations of the Clean Air Act.

**FACTS**

The events leading up to Fern's indictment and eventual convictions began on October 3, 1993. Early that morning, a fire partially damaged the Monte Carlo Oceanfront Resort Hotel, a thirteen-story building on Miami Beach. The Monte Carlo was insured for up to two million dollars under a fire loss policy the Lexington Insurance Company issued. Under the fire loss policy, Lexington agreed to pay for asbestos removal and contamination at the Monte Carlo, but only if the asbestos-related contamination occurred as a result of a fire.

Shortly after the fire, Waquar Ahmed Khan, the president of the company that owned the Monte Carlo, contracted with Fern to determine whether the Monte Carlo's conference room and suites were contaminated with asbestos as a result of the fire. At the time, Fern owned an asbestos testing and consulting firm known as Air Environmental Research Services (AER). Fern then orchestrated a fraudulent scheme to (1) convince Lexington that the Monte Carlo was contaminated thoroughly with asbestos; and (2) profit from a bogus asbestos abatement project at the Monte Carlo.

The scheme unfolded, in part, as follows. Fern directed the Monte Carlo project manager, Jerry Joyner, to take a piece of "Mag Block" -- a material containing chalky, crushable asbestos -- from a crawl space at the Monte Carlo. Fern then directed Jerry Joyner to take some

2

"hot" air samples from the Monte Carlo using the Mag Block to spike the samples. (In total, Jerry Joyner spiked over twenty samples, often in the presence of Fern, Fern's wife or other AER employees.) After Jerry Joyner spiked the samples, he labeled some of them -- at Fern's request -- as if they came from the Monte Carlo's pipe-chases. Fern made this request in order to support a claim of asbestos contamination within the entire Monte Carlo resort.

After receiving test results from the spiked air samples, Fern's company, AER, proceeded to prepare an emergency action plan detailing a proposed asbestos abatement project for the Monte Carlo. Neither Fern nor AER was licensed to conduct asbestos abatement or removal work. Consequently, Fern needed to list the name of an authorized asbestos abatement company on the asbestos abatement project paperwork required under 42 U.S.C. § 7413, a provision of the Clean Air Act.[1]

On October 13, 1993, Fern, or one of his employees, filed the first of three Ten-Day Notices completed during the course of the proposed Monte Carlo asbestos abatement project. This Ten-Day Notice -- as well as subsequent notices filed on December 14, 1993, and April 4, 1994 -- contained false responses indicating that a company named Action Systems Unlimited, Inc., was responsible for the asbestos abatement project at the Monte Carlo, and that Judy Joyner -- Jerry Joyner's sister-in-law and the president of Action Systems -- was the on-site supervisor.[2] The Ten-Day Notice also contained Judy Joyner's forged signature on the notice lines indicating

_____

[1] Specifically, Fern needed to list the name of an authorized company on government-required "Notification of Demolition and Renovation" forms, commonly known as "Ten-Day Notices."

[2] The third notice is slightly different from the first two notices and is captioned "Notice of Asbestos Removal Project." While the first two notices are two-page forms, the third notice is a one-page form. The differences between the forms do not affect our analysis.

3

that the information on the notice was correct and that an appropriately trained individual would be on-site at the Monte Carlo during the asbestos abatement project.[3] The first and third Ten-Day Notices also contain references to Judy Joyner's Florida asbestos removal license number.

Neither Judy Joyner nor Action Systems ever did any work at the Monte Carlo. Moreover, Judy Joyner testified at trial that she never authorized anyone to sign her name, use Action Systems's name or use her asbestos removal license number on a Ten-Day Notice for the Monte Carlo asbestos abatement project. Nevertheless, Fern instructed Jerry Joyner to tell anyone who inquired that he worked for Action Systems and that Action Systems was the actual asbestos removal contractor at the Monte Carlo.

At trial, two officials with the Metropolitan Dade County Department of Environmental Resources Management (DERM) testified about the significance of the Ten-Day Notices. According to Hugh Wong, chief of DERM's Air Pollution Control section, Ten-Day Notices are federally required notices that provide information on sites so that regulators can make sure that work is going to be done properly. Wong testified that he "absolutely" relied on the information contained in Ten-Day Notices and that it is important for the information to be accurate. Wong also indicated that DERM uses the information in Ten-Day Notices to determine if the contractor is certified or not, and stated that "if we have not inspected that contractor's work before, we try and target the inspections [to that contractor]." Ray Gordon, a DERM asbestos supervisor, testified that before employees in his office input information from Ten-Day Notices into their computers, they check to make sure that the contractor has a license number noted on the Notice

---

[3]    The text under Judy Joyner's forged signature indicated that the signature above belonged to the "Owner/Operator" -- an apparent reference to the facility owner or renovation project supervisor.

4

and that the contractor is familiar to them. According to Gordon, the only way DERM officials can know if the individual removing asbestos is properly trained is "if they have the appropriate license."

In addition to submitting false Ten-Day Notices, Fern, and/or AER, also filed documents representing that the contents of the Monte Carlo (e.g., room furnishings and equipment) had to be destroyed because of asbestos contamination. In actuality, Fern gave away, sold or kept most of the Monte Carlo's furnishings and equipment.

Ultimately, Fern submitted a bill for over five hundred thousand dollars to the Monte Carlo for the cost of the bogus asbestos abatement project. The bill was converted into a proof-of-loss and submitted to Lexington via the mail. At trial, Daniel Corbeil, a former co-owner of Action Systems, testified that Fern bragged to him about how he fooled Lexington with spiked samples and with the Action Systems license.

In 1994, the Environmental Protection Agency (EPA) started investigating Fern's work at the Monte Carlo. Jerry Joyner and other AER employees cooperated with the EPA. Jerry Joyner played a critical role in the investigation; he taped his conversations with Fern. During those conversations, Fern offered Jerry Joyner ten thousand dollars to mislead investigators and told him to lie to the grand jury.

**PROCEDURAL HISTORY**

A grand jury indicted Fern on June 16, 1994, charging him with one count of witness intimidation. The government obtained a superseding indictment from the grand jury on August 12, 1994, charging Fern with eight other counts: three counts of making false statements, four counts of mail fraud and one count of witness tampering.

5

Fern's first trial began on November 28, 1994. Prior to the testimony of the government's first witness, Fern moved to dismiss the three false statement counts of the indictment for failure to allege essential elements of the charged crime. Fern argued that the indictment was insufficient because it did not allege that the statements were made willfully or that the statements were material. Fern also argued that the indictment did not inform him of the specific statements that were allegedly false. The district court denied Fern's motion and allowed the government to proceed with its presentation of evidence on all counts of the indictment.[4]

On November 28, 1994, the government called its first witness, Bureau of Alcohol, Tobacco and Firearms (ATF) Special Agent Nelson Vasquez. Two days after Vasquez testified, on December 1, 1994, the prosecutor received a sworn statement dated December 1, 1994, from ATF Internal Affairs. The statement revealed that Vasquez misused his government credit card and was under investigation for theft of government property. The next day, Friday, December 2, 1994, the prosecutor produced a Brady disclosure regarding the Vasquez misconduct. The following trial day, Monday, December 5, 1994, Fern sought to recall Vasquez to the stand for further examination. The prosecutor informed Fern that Vasquez would invoke the Fifth Amendment and decline to answer defense questions. After verifying this, Fern asked for a mistrial, which the district court granted.

---

[4] In her response to Fern's motion to dismiss, the prosecutor specifically indicated that the false statements on the Ten-Day Notices were as follows: (1) statements indicating that Action Systems was the contractor doing the abatement project; (2) statements indicating that Judy Joyner was the project's contact person; and (3) statements indicating that Judy Joyner signed the Ten-Day Notices. Fern did not renew his motion to dismiss the indictment prior to his second trial.

6

Fern subsequently moved to dismiss the case based on the Double Jeopardy Clause. Fern based his motion on the fact that Thomas Mulvihill, an Assistant United States Attorney (AUSA) in the Public Corruption Section, knew about the Vasquez investigation as early as November 15, 1994, but never shared his knowledge with the prosecutor in Fern's case.

The district court conducted an evidentiary hearing on the mistrial motion during which the district court questioned the prosecutor and AUSA Mulvihill, and heard arguments from the prosecutor and Fern regarding applicable case law. The district court also allowed Fern to question Mulvihill. During questioning, Mulvihill testified that he learned about allegations against Vasquez as a result of a conversation with an ATF Internal Affairs agent. During the conversation, the ATF agent told Mulvihill that it was possible that a "totally innocent explanation" existed for Vasquez's actions. Mulvihill also indicated that he and the ATF agent agreed that the matter should initially proceed through the ATF's administrative process. Mulvihill then stated that he did not even hear about the Vasquez matter again until after Fern's trial commenced. Mulvihill further testified that he was unaware that Vasquez was the case agent in any pending cases. Finally, Mulvihill stated that he was unaware of any policy requiring him to notify other attorneys about allegations against ATF agents that his office was not pursuing.

After considering the evidence and arguments, the district court orally denied Fern's motion. The district court later entered a written order denying Fern's mistrial motion and Fern's ore tenus motion to stay proceedings pending an appeal on the alleged double jeopardy violation. The district court then scheduled a second trial for January 19, 1995. Fern appealed the district court's order, and that appeal is consolidated here.

In Fern's second trial, Vasquez did not testify, and the government dropped the witness intimidation count. During the course of the second trial, Fern presented expert testimony that the Monte Carlo could have been contaminated from the fire; witness testimony that Jerry Joyner spiked the samples; and witness testimony that Curry Joyner, Judy Joyner's ex-husband, signed Judy Joyner's signature on the Ten-Day Notices with her authorization. Fern also sought to cross-examine witnesses about, or introduce polygraph evidence relating to, Jerry Joyner, but was allowed to do so only to a limited extent.[5]

The jury in Fern's second trial convicted him on February 7, 1995. Fern received a sentence of fifty-seven months of imprisonment, plus a subsequent three-year term of supervised release and a four hundred dollar special assessment.

## ISSUES

Fern raises six issues on appeal. We find each unpersuasive and address only three: (1) whether the Double Jeopardy Clause barred Fern's retrial after Fern requested a mistrial; (2) whether the superseding indictment contained sufficient information to sustain the three false statement counts against Fern; and (3) whether the district court's failure to submit the issue of materiality to the jury was harmless error.[6]

## CONTENTIONS

---

[5] Fern first tried to cross-examine EPA agent John Lara, after Lara indicated on direct examination that he corroborated Jerry Joyner's testimony with a polygraph. Fern later tried to cross-examine Jerry Joyner regarding the polygraph results. In both instances, the district court strictly limited Fern's examination, based, in part, on the government's representation that Jerry Joyner failed only a part of the polygraph.

[6] Fern's other appeal issues concern various evidentiary rulings and the jury instruction in this case. We affirm on these issues pursuant to Eleventh Circuit Rule 36-1.

Fern contends that the Double Jeopardy Clause barred his retrial because the government's conduct left him with no choice but to ask for a mistrial. Fern also contends that the false statement counts of the indictment against him were insufficient because they failed to include necessary allegations of willfulness and materiality, and failed to identify the particular false material statements Fern made. Finally, Fern contends that the failure to submit the issue of materiality to the jury was "incurably prejudicial," i.e., not harmless error, because a reasonable juror could have concluded that the alleged false statements were not material because environmental officials did not rely on the statements in their decision-making process.

The government contends that the Double Jeopardy Clause posed no barrier to Fern's retrial because the prosecution did not "goad" Fern into requesting a mistrial. The government also contends that the false statement counts of the indictment contained sufficient allegations to apprise Fern of the charges against him and to warrant an inference that the grand jury found probable cause to support all the essential elements of the charges against Fern. Finally, the government contends that materiality was not a jury issue in this case. Alternatively, the government contends that the failure to submit the issue of materiality to the jury did not constitute reversible error because no reasonable juror could have found that the alleged false statements in this case were not material.

**DISCUSSION**

A.      Double Jeopardy

Ordinarily, the Double Jeopardy Clause does not bar retrial after the grant of a mistrial upon the defendant's motion. United States v. Torkington, 874 F.2d 1441, 1444 (11th Cir. 1989). If the prosecution's actions compelled the defendant to move for a mistrial, however, the

9

Double Jeopardy Clause does bar retrial. 874 F.2d at 1444. As we observed in Torkington, a defendant is compelled to move for a mistrial if the prosecution intentionally goaded the defendant into moving for a mistrial. 874 F.2d at 1444.[7] The inquiry into the prosecution's intent is, for the most part, a matter to be inferred from objective facts and circumstances. See Oregon v. Kennedy, 456 U.S. 667, 679-80 (1982) (Powell, J., concurring) ("Because 'subjective' intent often may be unknowable, I emphasize that a court -- in considering a double jeopardy motion -- should rely primarily upon the objective facts and circumstances of the particular case."). We review the district court's factual findings for clear error and we conduct a de novo review of the district court's application of the law to the facts. Torkington, 874 F.2d at 1445.

In this case, the district court did an exceptional job of investigating the objective facts and circumstances leading up to the prosecution's disclosure of Special Agent Vasquez's misconduct. The district court conducted an evidentiary hearing regarding the prosecutor's knowledge and conduct, and the knowledge and conduct of the other relevant government actor, AUSA Mulvihill. In so doing, the district court properly recognized that government prosecutors do not operate in a vacuum, and that under some circumstances the actions of more than the specific prosecutor assigned to a case may be relevant to the "goading" inquiry. See United States v. Dinitz, 424 U.S. 600, 611 (1976) (Double Jeopardy Clause "protect[s] a defendant against governmental actions intended to provoke mistrial requests") (emphasis added). After questioning the relevant parties, and allowing Fern to ask additional questions, the

---

[7] Webster's Third New International Dictionary defines "goad," in part, as follows: "to drive, incite, or rouse." When used as a noun, Webster's indicates that a goad is "something that urges or stimulates like a goad: SPUR, STIMULUS." Webster's Third New International Dictionary 972 (3d ed. 1976). In the past, we have suggested that goading may be found where the conduct of the government in bringing about the original mistrial is due to "gross negligence or intentional misconduct." United States v. Serra, 882 F.2d 471, 473 (11th Cir. 1989).

10

district court determined that the investigation into Vasquez's conduct was preliminary at the time Mulvihill heard of it; the relevant parties did not know of any actual impropriety until December 1, 1994; and the relevant parties promptly informed the defense of Vasquez's impropriety. After independently reviewing the record we find no error in the district court's factual findings.

We also discern no error in the district court's legal conclusions to the effect that the relevant events revealed no bad faith, prosecutorial misconduct or attempt to subvert the protections of the Double Jeopardy Clause. Fern may very well have needed to move for a mistrial in this case, but this need did not arise because of "goading" on the government's part.

B.      Sufficiency of the Indictment

"A criminal conviction will not be upheld if the indictment upon which it is based does not set forth the essential elements of the offense." United States v. Gayle, 967 F.2d 483, 485 (11th Cir. 1992) (en banc), cert. denied, 507 U.S. 967 (1993). This rule serves two functions. First, it puts the defendant on notice of "the nature and cause of the accusation as required by the Sixth Amendment of the Constitution. Second, it fulfills the Fifth Amendment's indictment requirement, ensuring that a grand jury only return an indictment when it finds probable cause to support all the necessary elements of the crime." Gayle, 967 F.2d at 485. The law does not, however, require that an indictment track the statutory language. United States v. Stefan, 784 F.2d 1093, 1101 (11th Cir.), cert. denied, 479 U.S. 855, and cert. denied, 479 U.S. 1009 (1986). If an indictment specifically refers to the statute on which the charge was based, the reference to the statutory language adequately informs the defendant of the charge. Stefan, 784 F.2d at 1101-02. Similarly, if the facts alleged in the indictment warrant an inference that the jury found

11

probable cause to support all the necessary elements of the charge, the indictment is not fatally deficient on Fifth Amendment grounds. Cf. United States v. McGough, 510 F.2d 598, 602 (5th Cir. 1975) (if facts alleged warrant inference that false statements are material, an indictment is sufficient).[8]

Counts I-III of the superseding indictment charged that Fern, on three separate dates, "did knowingly make false statements on the Notification of Demolition and Renovation form filed, and required to be maintained, pursuant to the Clean Air Act . . . in violation of Title 42, United States Code, Section 7413(c)(2)."[9] Fern contends that these counts of the indictment are

---

[8] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[9] Title 42 U.S.C. § 7413(c)(2) provides that:

Any person who knowingly -

    (A)    makes any false material statement, representation, or certification in, or omits material information from, or knowingly alters, conceals, or fails to file or maintain any notice, application, record, report, plan, or other document required pursuant to this chapter to be either filed or maintained (whether with respect to the requirements imposed by the Administrator or by a State);

    (B)    fails to notify or report as required under this chapter; or

    (C)    falsifies, tampers with, renders inaccurate, or fails to install any monitoring device or method required to be maintained or followed under this chapter

shall, upon conviction, be punished by a fine pursuant to Title 18, or by imprisonment for not more than 2 years, or both. If a conviction of any person under this paragraph is for a violation committed after a first conviction of such person under this paragraph, the

12

insufficient because they (1) fail to state expressly that "willfulness" and "materiality" are elements of a Clean Air Act false statement offense, and (2) fail to identify adequately the particular false statements Fern made.

Fern's contention regarding the failure to allege "willfulness" is meritless because "willfulness" is not an essential element of an offense under the relevant provision of section 7413(c)(2). Section 7413(c)(2)(A) makes it a crime for any person to "knowingly" make a false material statement in a document required to be filed or maintained. 42 U.S.C. § 7413(c)(2)(A). The plain language of the statute does not require a showing of willfulness, and we decline Fern's invitation to read willfulness into the statute via the language of section 7413(h) of the Clean Air Act.[10]

Fern's contention regarding the indictment's failure to allege "materiality" is more substantial, but still unpersuasive. Fern contends correctly that the indictment does not mention the word "material," and that a false statement must be a "material" statement to constitute a violation under the Clean Air Act. See 42 U.S.C. § 7413(c)(2)(A) (violation requires a "false material statement, representation, or certification"). The indictment does, however, specifically reference "Title 42, United States Code, Section 7413(c)(2)." Fern contends that this reference

maximum punishment shall be doubled with respect to both the fine and imprisonment.

42 U.S.C. § 7413(c)(2).

[10]  Section 7413(h) provides in part that certain lower-level employees will not be held liable for some Clean Air Act violations unless their actions are "knowing and willful." 42 U.S.C. § 7413(h). Even if section 7413(h) applied in this case -- and we do not hold that it does -- Fern would not be covered under it because, at the relevant time, he was the president of AER, not a lower-level employee.

13

is insufficiently specific to put him on notice that he allegedly violated section 7413(c)(2)(A). We find the omission of a reference to subsection (A) harmless.

The indictment charged Fern with making a "false statement." The only provision within section 7413(c)(2) that could even potentially concern false statements" is subsection (A) which begins with the following words: "makes any false material statement." 42 U.S.C. § 7413(c)(2)(A) (emphasis added). Subsection (B) of section 7413(c)(2) refers to failures to notify or report under the Clean Air Act, and subsection (C) refers to prohibited acts with "any monitoring device or method." 42 U.S.C. § 7413(c)(2)(B), (C). Because Fern could not read section 7413(c)(2) and conclude that he was charged with a violation of anything but section 7413(c)(2)(A), we reject his claim that the indictment failed to notify him of the charges that he had to defend. See Stefan, 784 F.2d at 1102 ("practical, rather than technical considerations govern the validity of the indictment").[11]

We also find unpersuasive Fern's related contention that the indictment fails to identify the false statements with sufficient particularity for Fifth Amendment purposes. In our view, Fern's contention is based on a false premise -- that "the indictment merely referenced three Ten-Day Notices, without identifying what statements in the notices were false."

Paragraph Four of the indictment specifically alleges that AER performed the asbestos abatement work at the Monte Carlo. Paragraph Seven of the indictment indicates that an owner or operator must notify the EPA or the appropriate local agency before conducting certain types of asbestos abatement in a building. Paragraph Nine of the indictment alleges that Fern was the

---

[11]    We also note that the government specifically apprised Fern of the specific false statements during a hearing prior to his first trial. Fern subsequently failed to renew his motion to dismiss -- or to request a bill of particulars -- prior to his retrial.

14

"operator" of an asbestos abatement project taking place at the Monte Carlo. The three Ten-Day Notices referenced in the indictment all indicate that Action Systems -- not AER -- performed the asbestos abatement project at the Monte Carlo under the on-site supervision of "Owner/Operator" Judy Joyner -- not under the supervision of "operator" Fern.

It is an entirely sensible inference that the false statements referred to in the indictment related to the specific allegations described earlier in the indictment, e.g., whether "operator" Fern notified the appropriate agency of AER's asbestos abatement project at the Monte Carlo.[12] Since the indictment also referenced the relevant statutory section, it is also a reasonable inference that the grand jury found that any false statements regarding the identity of the entity performing the Monte Carlo asbestos abatement project were "material." Accordingly, we are satisfied that Counts I-III of the superseding indictment comport with the Fifth Amendment's dictates.

C.    Gaudin Error

In United States v. Gaudin, 115 S. Ct. 2310 (1995), the Supreme Court held that the materiality of a false statement for the purposes of a conviction under 18 U.S.C. § 1001 is a jury question and that a district court's failure to submit the question of materiality to the jury constitutes reversible error. The Court's holding in Gaudin applies retroactively to cases on direct appeal at the time Gaudin was decided. See Griffith v. Kentucky, 479 U.S. 314, 328

_____

[12]    Any contrary inferences would require us to assume that the grand jury included the above-described references in paragraphs four, seven and nine of the indictment, as mere window dressing. We decline to view these references in such a fashion. We also note the tension between Fern's suggestion that the absence of some explicit language in the indictment is fatal, while the presence of other explicit language is of no moment.

15

(1987). When no assertion of error is made during the trial, and error arises only because of a later Supreme Court decision, we review for plain error. United States v. Calhoon, 97 F.3d 518, 529 (11th Cir. 1996), cert. denied, 118 S. Ct. 44 (1997). Under plain error review, reversal for unobjected-to error is permitted where the error is both (1) plain and (2) affects substantial rights. Calhoon, 97 F.3d at 529-30; United States v. Olano, 507 U.S. 725, 732 (1993). We have held that an improper instruction does not affect substantial rights when no reasonable argument exists that the statements at issue were not material. Calhoon, 97 F.3d at 530. Our cases also indicate that the burden of showing that an unobjected-to Gaudin error constitutes plain error rests with the defendant. United States v. Kramer, 73 F.3d 1067, 1074 n.17 (11th Cir.), cert. denied, 117 S. Ct. 516 (1996).

When a proper objection to a Gaudin error is lodged at trial the analysis differs, but, in our estimation, only with respect to the burden of persuasion. This is so because a Gaudin error does not fall within that limited class of errors known as "structural" errors, e.g., errors "'affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.'" Johnson v. United States, 117 S. Ct. 1544, 1549 (1997) (citing Arizona v. Fulminante, 499 U.S. 279, 310 (1991)). To the contrary, a Gaudin error is more correctly viewed as analogous to improperly instructing the jury on an element of the offense, an error that is subject to harmless error analysis. See
United States v. Raether, 82 F.3d 192, 194 (8th Cir. 1996) ("Gaudin errors are trial errors subject to harmless error review"); cf. Johnson, 117 S. Ct. at 1550 (stating that "[i]t is by no means clear" that a Gaudin error fits within the limited class of cases subject to structural error

16

analysis).[13] The appropriate review under the harmless error review standard mirrors the plain error review standard regarding prejudice to substantial rights, except that the burden of persuasion shifts: the government must show the absence of prejudice to the defendant's substantial rights. Cf. Olano, 507 U.S. at 734-35 (plain error analysis into prejudice is the same kind of inquiry as employed in harmless error analysis, with one important difference: "it is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice").

In this case, the government contends that the holding of Gaudin does not extend to false statements under section 7413(c)(2). As a result, the government contends, the district court did not err when it failed, over Fern's objection, to submit the issue of materiality to the jury. We decline to reach this issue because we conclude that even if Gaudin does apply, the government has carried its burden of showing the absence of prejudice to Fern arising from the claimed Gaudin error.

Here, the government's burden, more precisely stated, is to show that the guilty verdict rendered against Fern was "surely unattributable" to the incorrect jury instruction regarding the false statements on the Ten-Day Notices. See Sullivan v. Louisiana, 508 U.S. 275, 279 (1993) (inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error"); Raether, 82 F.3d at 194 (same). At trial, the district court instructed the jury as follows:

---

[13]    In his reply brief, Fern effectively conceded that harmless error analysis applies in this case when he indicated that "[t]he court's erroneous jury instruction is not . . . harmless on this record."

17

Title 42, United States Code, section 7413(c)(2)(A) makes it a federal crime to knowingly make any false material statement, representation or certification in any notice, report or other document required to be filed or maintained pursuant to the Clean Air Act. The defendant can be found guilty of that offense only if all of the following facts are proved beyond a reasonable doubt:

First: The defendant was the owner or operator of the facility being renovated.

Second: That the combined amount of regulated asbestos-containing material stripped, removed, dislodged, cut, drilled or similarly disturbed was at least 260 linear feet on pipes or 160 square feet on other facility components.

Third: That the notifications of demolition and renovation were filed as required under the Clean Air Act.

Fourth: That the defendant knowingly made a false material statement in the notification.

Fifth: That the defendant knew the statement was false at the time the notification was submitted.

The 10-day notices of renovation and demolition in this case are documents which are required to be filed and maintained pursuant to the Clean Air Act.

You are further instructed that the Court has already determined that the statements in this case were material. And I find that the statement that Action Systems was the contractor who was to remove the asbestos is a material statement, and that the signature of Judy Joyner was a material representation. That is a fact question for you to determine. You determine on the evidence whether it was authorized, as argued by the defendant, or was not authorized, as argued by the government.

The district court later clarified the last portion of the instruction, stating that "[t]he Government must prove beyond a reasonable doubt, in order to find the defendant guilty of those three counts concerning that statement, that that statement was false, that [the signature of] Judy Joyner was not authorized." In addition, the district court instructed the jury that "[t]he word

18

'knowingly,' as that term has been used . . . in the instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident."

Given the facts of this case, we can say beyond any reasonable doubt that the district court's alleged error did not contribute to the guilty verdict in this case. We know this for several reasons. First, the trial testimony regarding the statements at issue uncontrovertedly established that they met the <u>Dennis</u> test. DERM officials Wong and Gordon testified that they "absolutely" relied on the information contained in Ten-Day Notices and that the "only" way DERM officials can know if the individual removing asbestos is properly trained is if they have the appropriate license. On cross-examination, Curry Joyner, a witness that Fern called, engaged in the following exchange:

Prosecutor: Now, it's important on the ten-day notices that there be a signature at the bottom, you testified?

Joyner: Yeah, you should always sign them.

Prosecutor: In fact, you said that was important, even if Donald Duck's name was on it?

Joyner: Right, as long as you make the notification and it gets to D.E.R.M. that in ten days from now there will be a job starting.

Prosecutor: Mr. Joyner, why didn't you sign your name? Why didn't you sign Curry Joyner?

Joyner: Because it's her license. I just signed her name.

Prosecutor: If Donald Duck could sign, couldn't Curry Joyner?

Joyner: Well, I mean, okay -- well, if Donald Duck could write Judy Joyner, he could write Judy Joyner.

19

Curry Joyner went on to testify that "we couldn't have done the [Monte Carlo] job without her [Judy Joyner] license." Both prosecution and defense witnesses thus firmly established the materiality of the name signed on the signature line of Ten-Day Notices, demonstrating beyond doubt that materiality was not a genuine <u>factually</u> disputed issue in this case.

Second, we believe the jury necessarily credited the foregoing testimony establishing the materiality of the false statements when it rejected Fern's two-pronged defense theory. That defense theory was that Judy Joyner's forged signature was authorized, and that no evidence showed beyond a reasonable doubt that "Dan Fern submitted the form; that Dan Fern knowingly made any false statements on that form . . . [; and] that the form was submitted for any improper purpose." When the jury found that the signature was not authorized and was knowingly forged -- forged "voluntarily and intentionally and not because of mistake or accident," <u>i.e.</u>, forged for an improper reason -- it necessarily found that the signature was forged because Fern believed Judy Joyner's signature might positively influence DERM officials in the exercise of their regulatory oversight duties. If the jury had not so concluded it would have characterized the false signature as a "mistake or accident" and acquitted Fern.

The jury's finding that Fern acted "knowingly" in this case is, in our view, so closely related to the materiality issue that it is functionally equivalent to a materiality finding. Accordingly, the district court's failure to properly describe the elements of a false statement offense under section 7413(c)(2)(A), if error, was harmless in this particular case. See <u>Sullivan</u>, 508 U.S. at 280-281 (error may be harmless where jury findings regarding certain facts "are so

20

closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact") (internal citation omitted).[14]

---

[14] Because the jury effectively found the false statements material in this case, we find Fern's reliance on our holding in United States v. Medina, 90 F.3d 459 (11th Cir. 1996), unavailing. In Medina, we held that a trial judge cannot direct a verdict in favor of the government regarding all or even one element of a crime. 90 F.3d at 464. That holding is correct because a criminal conviction must rest upon a jury determination that a defendant is guilty beyond a reasonable doubt. Medina is inapposite in this case because the jury did find Fern guilty of the false statement offenses, and its finding that Fern acted "knowingly" incorporated the element of materiality.

21

## CONCLUSION

For the foregoing reasons, we affirm Daniel Fern's convictions.

**AFFIRMED.**