**UNITED STATES of America**

**v.**

**James STERBA.**

**No. 97–441–CR–T–23E.**

United States District Court,
M.D. Florida,
Tampa Division.

Aug. 13, 1998.

Stephen Kunz, U.S. Attorney's Office, Tampa, FL, for U.S.

Anthony Martinez, Federal Public Defender's Office, Tampa, FL, for Defendant.

## ORDER DISMISSING INDICTMENT

MERRYDAY, District Judge.

The grand jury indicted James R. Sterba (Sterba) for allegedly violating 18 U.S.C. § 2422(b)[1] by soliciting a minor for an unlawful sexual encounter.[2]  Sterba allegedly utilized a computer and the services of one of the adult "chat rooms" of America Online (AOL) to contact and persuade a putative minor to engage in sexual activity with him at an agreed time and place.  A "chat room" is a service, available through the much-discussed "Internet," by which a participant sends to and receives messages from an unseen person who presumably shares some particular enthusiasm, in this instance, sexual intercourse.

---

1.  18 U.S.C. § 2422(b) states that:
   Whoever, using any facility or means of interstate or foreign commerce, including the mail, or within the special maritime and territorial jurisdiction of the United States, knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years to engage in prostitution or any sexual act for which any person may be criminally prosecuted, or attempts to do so, shall be fined under this title or imprisoned not more than 10 years, or both.

2.  Nothing in this order is intended as criticism of Charles R. Wilson, the United States Attorney; Mr. Kunz; or others who came to this problem after it occurred.  Although technically accountable for the acts and omissions of his assistants, Mr. Wilson has acted responsibly by referring this matter to the Department of Justice for an ethics inquiry and by appointing supervisory assistants to manage the issue of dismissal of the indictment.

After both the United States and Sterba completed their trial presentation and rested their respective cases, Sterba interposed a motion for mistrial based upon both the government's misidentification of a material witness and the consequent infringement of Sterba's sixth amendment right to confront the witnesses against him. I granted the motion. Sterba now seeks dismissal of the indictment based upon his fifth amendment immunity from being "for the same offence ... twice put in jeopardy ...", a right commonly called his immunity from "double jeopardy."

### FINDINGS OF FACT

On October 15, 1997, the United States Attorney filed a grand jury indictment against Sterba and alleged a violation of 18 U.S.C. § 2422(b).[3] On October 28, 1997, the magistrate judge entered a typical pretrial discovery order, paragraph II(B) of which states, among other things:

> The Government shall disclose to the defendant the existence and substance of any payments, promises of immunity, leniency, preferential treatment, or other inducements made to prospective Government witnesses, within the scope of *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The Government shall supply the defendant with a record of prior convictions of any witness who will testify for the Government at trial. The Government shall make available any application to the court for immunity of a witness as well as any order issued in response to the application.

On January 26, 1998, Sterba sought to interview an informant whose existence was revealed in response to this order. However, the United States declined to permit an interview and refused to reveal the informant's name until the beginning of trial. The magistrate judge agreed with the United States.

Trial began on May 18, 1998, without revelation to the defense of the informant's name. The United States' pretrial compliance included a witness list that named "Gracie Greggs" as a government witness. Both the defense and I accepted the representation that the name of the witness was "Gracie Greggs." In accord with established practice, I called upon the Assistant United States Attorney (the AUSA) to read the witness list to the venire, presumably to assist the prospective jurors' identifying any connection to or information about the United States' witnesses.

> THE COURT: Let's do this, [AUSA], let me ask you on behalf of the United States to stand and identify any individuals that you think even possibly could be called as witnesses in this case, if you're prepared to do so; you are.
>
> [AUSA]: Yes, sir.
>
> THE COURT: Okay. Understand that all of these people probably are not going to be called. But it is better to err on the side of telling you who they are and see if you know any of them, rather than have a surprise in the middle of the case. [AUSA].
>
> [AUSA]: *Gracie Greggs*, Carole Dumestre, Chuck Esposito, Christie Hargrove, Roger Joseph, Brian Christe, Alma Franklin, Ann Harafin, Jerry Herron, Linda Mitchell, A.J. Suarez, and John Bischoff.
>
> THE COURT: Bischoff.
>
> Do any of you think that you know any of those people from any source whatsoever or anything about them? Again, they ought to be strangers to you. If one of those people gets on the stand here they should be a stranger to you....

(emphasis added) Without informing the presiding judge, the United States commandeered this process to its own use by knowingly disguising the identity of a government witness and deceptively using the name "Gracie Greggs."

---

**3.** After Sterba's arrest, the magistrate judge set a $30,000 secured bond for Sterba's release. Failing to fulfill the bond requirement, Sterba remained incarcerated until July 31, 1998, at which time, pursuant to my suggestion to Sterba's counsel, Sterba was released by the magistrate judge.

The trial began and in due course the United States summoned "Gracie Greggs" to the witness stand. The following exchange occurred:

THE COURT: All right, [AUSA], who is your first witness?

[AUSA]: Gracie Greggs.

THE COURT: Gracie?

[AUSA]: Greggs.

THE COURT: Greggs.

[RULE 615 WAS INVOKED AND EXPLAINED.]

GRACIE GREGGS, GOVERNMENT'S WITNESS, SWORN

THE COURT: All right. Have a seat. Mr. Murray will assist you.

**DIRECT EXAMINATION**

BY [AUSA]:

Q. Good morning.

A. Hi.

[SEQUESTRATION RULE DISCUSSED]

Q. Good morning. Are you Gracie Greggs?

A. Yes

Q. Are you also Katie 16140?

A. Yes

Q. Okay. First off, can you tell us how old you are?

A. 35.

Q. And I want to ask you a little bit about your general background and experience in the field of computers. Have you attended any college courses in the field of information systems or computers?

A. Yes

Q. Okay. Tell—can you tell us a little bit about that.

A. I really enjoy working with computers. I enjoy working with the hardware versus the software, mostly. I have gone to college at University of Tampa and Mercer University. I currently am involved with an ISP, which is an Internet Service Provider. I've done it for years.

"Gracie Greggs" then presented a brief biography, which was not the biography of "Gracie Greggs" but of Adria Jackson. The witness was not Gracie Greggs nor, so far as the Court knows, does Gracie Greggs exist. (Probably, some innocent person somewhere has this now controversial name.) The testimony was false and manufactured *ad hoc*.

On Wednesday, May 20, 1998, I convened court to conduct a brief "charge conference," to entertain the summations of both the United States and the defense, and to begin jury deliberations. The discussion resolved some minor issues, among which was a proposed charge concerning statements by a defendant consequent upon an arrest. This exchange occurred with the AUSA:

THE COURT: I don't remember seeing [the instruction] in your set, but it seems to me that we ought to probably give it. We'll discuss where in just a minute.

Now,—help me [AUSA], Ms. Agent here from—who posed as the recipient of these communications, what was her name?

[AUSA]: Katie?

THE COURT: Well, yes, but what was the woman's name?

[AUSA]: Her name was Gracie Greggs.

THE COURT: Greggs. I guess—is that who you are talking about here in number 8? She wasn't using addictive drugs or promised any favoritism in any case. Is this necessary? Or who is this directed toward? Mr. Sterba is, at worst, a first offender, if he's an offender at all. So I'm not sure what we have got here.

It seems like this is inapplicable, Mr. Martinez.

MR. MARTINEZ: It is, Your Honor.

In short, the AUSA continued to further the deception that a witness named "Gracie Greggs" had appeared and testified.

The discussion then turned to entrapment. The defense expressed a concern about the absence of evidence of any predisposition of the defendant to commit a sexual offense against a minor. I inquired about "Gracie Greggs's" history with law enforcement.

THE COURT: [AUSA], with respect to—and I still cannot remember her name—what is her name?

[AUSA]: Gracie Greggs.

THE COURT: Greggs, is this an isolated instance of her serving as an informant or is she a regular government—I mean does she have any other relationship with the government other than this isolated episode?

[AUSA]: She had—with regard to other cases, she has one other case that resulted in an arrest. Her general status is that there was an understanding that she could work for a period of up to a year, but I don't think that she is currently working for the United States Customs. So at this point she isn't, but she has done one other case, if that helps—

THE COURT: Was she some sort of—has she some sort of history in law enforcement?

[AUSA]: Not that I'm aware.

THE COURT: And I think she testified to this, I just don't remember what it was, how did law enforcement find her and her skills and—

[AUSA]: She was—Customs was investigating another crime.[4] And as a result of that, she was interviewed. And at the time that she was interviewed, although it wasn't an investigation that Ms. Dumestre was conducting, she was associated or assisting the investigation, so that's how—

THE COURT: Who is she now?

[AUSA]: Carole Dumestre. Carole Dumestre, the agent, was assisting another Customs agent from Oklahoma on an investigation in which the witness was questioned—

THE COURT: Her name popped up and she got interviewed.

[AUSA]: Exactly. She got interviewed. And then Agent Dumestre thought, hey, she's local and she obviously knows a lot about computers and let's bring her on in.

THE COURT: Okay. But she's not a repetitive source—

[AUSA]: She was acting—

THE COURT: She was what?

[AUSA]: Well, she's not a repetitive source, but she was clearly acting as a Customs informant at the time she did this. I mean this all happened before she had been signed up by customs before her contact with Mr. Sterba.

THE COURT: And I take it recruited for that by your case agent?

[AUSA]: Yes. Absolutely.

Prompted by this discussion about "Gracie Greggs," Mr. Martinez raised in behalf of the defense some serious questions about "Gracie Greggs."

MR. MARTINEZ: Well, the government indicates that the informant's name is Gracie Greggs. This witness, as you may recall, did testify that her name was Gracie Greggs. Well, I sent my investigator out to do a computer check, an Autotrak check, on the background of Ms. Gracie Greggs to see if there were any prior convictions of record. And we couldn't find any. We couldn't find this person. Gracie Greggs did not exist. I mean zilch, no credit history, no nothing. After the government rested and after the defendant rested, I then approached [the AUSA] and asked [the AUSA]—and I advised her that our investigator had gone out to research the background of this witness under Gracie Greggs. And she indicated that, oh, that's not her real name, that's her confidential informant Customs name.

THE COURT: She testified here it was her name.

MR. MARTINEZ: That's correct. She said—[the AUSA] said her real name is Adria Jackson. This was after the government rested, after the defendant rested. I go back with my investigator—my investigator stayed in the office

---

4. The AUSA omitted the provocative fact that this crime investigation involved "Gracie Greggs" as a suspect in a pornography crime.

until nine o'clock last night running a check, and, yes, there is an Adria Jackson that exists, we do have information about her, but it is going to take us some time to even gather any information, because we were working under the assumption that the main government witness, the confidential informant's name, was Gracie Greggs.

We originally filed—

THE COURT: Wait a minute here. [AUSA], did you allow this woman to testify as to her name in my court without telling me that she was going to testify to a false name?

[AUSA]: Well, Your Honor—

THE COURT: First of all, yes or no. You either did that or you didn't. Did you know that she was going to testify to a name other than her lawful name?

[AUSA]: Yes. Yes, I knew she would testify that her name was Gracie Greggs. However, that is a name that has been given to her by Customs. Everything—every document says Gracie Greggs on it. So that's a name that—that's her name as far as Customs and this case is associated with it. So I didn't consider that to be—I consider that to be her name. She has other names. Just like when you get married, you have other names.

THE COURT: It is not quite like when you get married.

MR. MARTINEZ: Judge, my client has a—

THE COURT: It is a little bit like if I went out—if I dispatched the marshal out to get someone to sit right over there in that defense seat, with the idea that they would imitate the defendant and the defendant was safely out of the courtroom, is that just sort of like when you get married?

[AUSA]: No.

THE COURT: You bet it is not.

Having received from the United States the concession that the witness was not "Gracie Greggs" and that "Gracie Greggs" was a *nom de plume* attached by a government agency for its internal purposes, Mr. Martinez interposed a motion for a mistrial based upon deprivation of sixth amendment rights of confrontation.

MR. MARTINEZ: Judge, Mr. Sterba, obviously, under the Constitution, has a right to cross-examine and question witnesses, confront witnesses that are presented before him. He was under the impression, I was under the impression, the court was under the impression, the jurors are under the impression, that the main government witness was a Gracie Greggs. This individual does not exist, Judge. Mr. Sterba's constitutional right to examine and cross-examine witnesses has been clearly violated, denied.

I would ask the court to declare a mistrial.

THE COURT: [AUSA]?

[AUSA]: Your Honor, she—I disagree that she doesn't exist, because she does exist, because they—Customs creates identities for people and they created an identity that exists in documents with Customs for her as Gracie Greggs. And as far as Mr. Martinez's argument that they would research—I mean I told them she had no record. The only inducements or promises that were made to her were revealed. And as a matter of fact, I mean we started this trial on Monday, she testified—I mean I'm sorry, we started the trial on Monday, she testified Tuesday morning first thing, so I don't know what if any prejudice they can show.

MR. MARTINEZ: Judge, prejudice, why did [the AUSA] then come up to me Tuesday afternoon and tell me that Gracie Greggs is not her real name, her real name is Adria Jackson? For her to say that there's no prejudice, my client has a right to know who the people are who are testifying against him and confront them and cross-examine them. And he—we were questioning a fictitious person, and could not find out her background, could not find anything to do an adequate defense under the Constitution.

THE COURT: [AUSA], when you say that she had got this identity from Customs,

I take it she hasn't done a name change and that sort of thing? It is just, in effect, a false identification bearing the imprimatur of a government agency?

[AUSA]: I would—that's an adequate characterization of what it is.

After a brief recess, I granted the motion for a mistrial. (Obviously, the defense was compelled by circumstances to seek a mistrial. However, as an observer of the proceedings, I am far from convinced that an acquittal or a "hung jury" would not have occurred.)

In any event, the defense thereafter moved to dismiss the indictment on double jeopardy grounds. The United States failed to either file a timely response or seek an enlargement of the time to respond. The defense filed a "Motion To Grant Defendant's Motion To Dismiss Because It Is Deemed Unopposed." The United States filed a motion for leave to file out of time. The motion suggests that the delay was caused by a wholesome desire to research thoroughly and consult with supervision. The motion neither acknowledges tardiness nor accepts responsibility, choosing instead to deflect the discussion elsewhere. The motion was granted in the interests of justice notwithstanding its tardiness and patent disingenuousness, an attribute shared with the United States' response on the merits, which states in part:

> [G]overnment counsel took care to ensure that the witness would truthfully answer all questions that were asked of her regarding her identity. In this vein, during direct examination, government counsel did not ask the witness for her name. Rather, a review of the record demonstrates that the witness was asked the following:
>
> Q: "Are you Gracie Greggs?"
>
> A: "Yes."
>
> Q: "Are you also Katie 16140?"
>
> A: "Yes."

There were no further questions relating to the witness's identity on direct. During cross examination, the witness acknowledged that the information that appeared on her AOL profile was false, and that her name was not Katie.

The witness's answers to questions about her identity were literally true.

The issue here is not whether the witness is named "Katie." Of course, she isn't and she said that she was *not* "Katie." The issue is whether she is "Gracie Greggs," which she is *not* and which she did *not* renounce during her testimony. The most the government does in its response is explain why this fraud was advanced in court. The response understandably omits the issues of why an AUSA should decide what degree of truthfulness in testimony is deserved by the court, how an AUSA can forgive the falsification of testimony by developing a competing consideration, and how an agency not entitled to do so can introduce *sub silentio* a falsified name into a court proceeding without judicial knowledge or consent (assuming its availability).

On July 23, 1998, a hearing occurred on the defense's motion to dismiss the indictment. In lieu of testimony, a stipulation of facts was executed and read into the record. In pertinent part, the stipulation establishes the following facts:

> Trial began on May 18, 1998. Mr. Sterba had not been provided with any discovery related to the confidential informant, including her name or any other material required by the Magistrate Judge's discovery order or *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).
>
> At jury selection the government provided Mr. Sterba with a witness list. Although the witness list contained the name "Gracie Greggs" the government did not identify that she was the confidential informant.
>
> "Gracie Greggs" took the stand and it became apparent that she was the confidential informant. As is custom, defense counsel requested that his investigator attempt to find out as much information as he could about the witness. The investigator had conducted a thorough search of all the public records data bases available to him. He, as well as federal public defender investigators in Atlanta and the West Coast determined that "Gracie Greggs" did not exist.

During the course of the day, the investigator spoke to Adria Jackson. He asked her if "Gracie Greggs" was her real name. She stated that it was. Although she provided the investigator with a birth date she refused to provide additional information about herself.

Defense counsel approached the government and told them that the defense team had been unable to find any information on "Gracie Greggs". The government informed counsel that was because "Gracie Greggs" was her "customs name" not her real name and proceeded to pull out the witness travel voucher which showed that the witness's name was Adria Jackson. Jackson had already left town.

Armed with the correct name and date of birth, the investigator was able to determine that evening that Jackson had lived in many different places and that there was at the least a pending contempt action against her. There was enough information available to suggest that there was valuable impeachment information available on this witness.

Despite confidence in his case, defense counsel was forced at that point to ask the Judge to declare a mistrial.

The government stated that they knew that the witness would testify under a false name and that they had instructed the witness to testify as to the false name and had deliberately structured the questions so that "the witness's testimony was true".

Ms. Jackson stated that the government had told her she could testify under a false name. She stated that it was her understanding that they had argued it with the Judge and that she would be allowed to testify under a false name.

Mr. Sterba through the course of his investigation, which included conversations with Jackson has determined the following information related to the use of Jackson as a confidential informant:

● Jackson was paid $2,000 for this case and was paid additional monies for another case she was involved in. These payment vouchers were in the government's possession before trial.

● Jackson came to Customs attention during their investigation of an international [pornography] ring. A member of that ring has since been convicted for his involvement with child [pornography]. Although, Jackson had no involvement with the child [pornography] aspects of this case, when she was questioned in relation to the investigation, her lawyer advised her to cooperate fully with Customs including offering to work for them if needed.

Subsequent to the mistrial being declared and the real name being provided the following impeachment material has been discovered by the defense:

● Jackson plead [sic] guilty to making a false statement and to filing a false police report. This case involved accusations that led to the arrest of an innocent man for armed robbery. In the many false statements made to police in the course of its investigation of a robbery at the Starvin Marvin where Jackson worked, she lied under oath to a Magistrate Judge. It was this lie that caused the Magistrate to sign the arrest warrant that led to the arrest of a former boyfriend of Jackson. Ms. Jackson was convicted under the Georgia First Offender statute, which allows that a defendant who successfully completes her probation would not be considered a convicted felon. However, for purposes of Federal Rule of Evidence 609 this plea is considered impeachment material.

● Witnesses reported that Jackson used drugs.

● She admitted that she has taken antidepressants in the past and indeed she had a prescription for Maprotiline issued in 1991 from the Clifton Springs Mental Health Center in Decatur, Georgia.

● She was at the time of trial involved in a family court dispute for which there was a pending contempt action.

● Several witnesses would also testify that her reputation in the community is one of an accomplished liar.

The Court heard oral argument from both sides and deferred ruling to allow additional evaluation.

As a result of my evaluation of the record and the facts elucidated at the hearing on the

motion to dismiss the indictment due to fifth amendment immunity from double jeopardy, I find the following facts:

The AUSA, acting in concert with Agent Dumestre of U.S. Customs Service, laid in a plan to utilize Adria Jackson as an *agent provocateur* of Internet liaisons between herself, posing artfully as a youthful and innocent girl, and men who would participate in these increasingly pointed, lascivious conversations. Jackson employed, among other things, her personal experience as a voluntary and active participant in "The Boys," an Internet pornography enterprise, to lend verisimilitude to her undertakings in an effort to procure Internet correspondents. Jackson's efforts ensnared Sterba, who in due course arranged a rendezvous at which he was arrested.[5]

The AUSA knew that Jackson had severe credibility problems arising from, among other things, Jackson's felonious police report and testimony, her rumored drug use, and her own involvement in sexually explicit activity on the Internet. (A review of transcripts of Jackson's conversations with Sterba readily confirms that Jackson is no novice to sexually provocative Internet "chat.") The AUSA wanted the defense to know none of this.

The AUSA either manufactured or accepted a plan to employ a fictitious name for Jackson and deploy that name in the service of the prosecution both before and during trial to further the prosecutorial goal of a conviction. The expectation was to proceed with the plan without the knowledge of the defense and without the knowledge or consent of the court. By that means, the AUSA could secure for the prosecution the presumed benefit of a conviction of Sterba, while avoiding any presumably unnecessary and bothersome little entanglements with whatever lingering facts might impinge the credibility of her featured witness. In short, the AUSA arrogated to herself the legal and moral authority to decide what truth became

public and, thereby, what fate awaited Sterba. The AUSA substituted herself for the judge, jury, and defense, in effect, making away with the fact-finding machinery.

This plan was not merely negligent or even grossly negligent. The plan was not to confront or evade the authority of the court by either brazenness or craftiness, that is, by openly pursuing some forbidden strategy— some question, some allusion, some source. *On the contrary, this plan was hatched with the notion that it would succeed, undetected and unimpaired. In this instance, success means jail for Sterba and a readily repeatable template for renewal in future occasions.* The conception and implementation of this plan was intentional and calculated to deprive the defense of its right of confrontation. It almost succeeded.

### CONCLUSIONS OF LAW

The issue of double jeopardy and its connection to prosecutorial misconduct is influenced decisively by *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), in which the court revisited the rule in *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), and *United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971). In *Kennedy,* the defendant was charged with theft of an oriental rug. The prosecution tendered the testimony of an expert in Middle Eastern rugs. The expert admitted that he had filed a criminal charge against the defendant, although the prosecutor sought no indictment based on the complaint. At trial, the prosecutor sought to rehabilitate the expert's credibility but the trial court persistently sustained the defense's objections. In a rather emboldened attempt to supersede the trial court's ruling, the prosecutor engineered this exchange:

Prosecutor: Have you ever done business with the Kennedys?

Witness: No, I have not.

---

5. This rendezvous was a vivid weakness in the government's proof. Sterba arranged to meet Jackson in the lobby of a local motel where he and his fellow bus drivers always stayed and where he was known on sight by motel employees and his colleagues. His meeting with Jackson was set for the lobby and not for his room. He claims the lobby was the chosen site so he could look at her and confirm her age—a plausible explanation. Jackson never arrived; law enforcement did.

Prosecutor: Is that because he is a crook?

After an evidentiary hearing, the trial court denied a motion to dismiss the indictment and found that a mistrial was not the intention and objective of the prosecutor in flouting the court's rulings. The appellate court reversed, holding that "overreaching" by the prosecutor warranted the protection of the double jeopardy clause. The appellate court found that the prosecutorial effort was a direct, personal attack on the defendant's character, leaving the defendant the choice of a tainted jury or a retrial.

Resolving the case notwithstanding both a dubious basis for jurisdiction and a severely splintered court, the Supreme Court marshalled sufficient votes for the result (but not the reasoning) and reversed the Oregon appellate court. The Supreme Court, considering in detail the reasons for the double jeopardy and mistrial protections, specified both the method and the content of the trial court's obligation when deciding motions for mistrial or to dismiss the indictment.

> [A] standard that examines the intent of the prosecutor, though certainly not entirely free from practical difficulties, is a manageable standard to apply. It merely calls for the court to make a finding of fact. Inferring the existence or nonexistence of intent from objective facts and circumstances is a familiar process in our criminal justice system.

> Only where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.

456 U.S. at 675, 102 S.Ct. at 2089.

The Supreme Court then evaluated the events in the Oregon trial and found that the Oregon appellate court had misapplied the federal standard. The Supreme Court reinstated the decision of the Oregon trial court and seized the opportunity to attempt a lucid recapitulation of the federal standard:

> Because of the confusion which these varying statements of the standard in question have occasioned in other courts, we deem it best to acknowledge the confusion and

its justifiability in the light of these statements from previous decisions. We do not by this opinion lay down a flat rule that where a defendant in a criminal trial successfully moves for a mistrial, he may not thereafter invoke the bar of double jeopardy against a second trial. But we do hold that the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial.

456 U.S. at 677, 102 S.Ct. at 2090.

In *United States v. Fern,* 117 F.3d 1298 (11th Cir.1997), *Kennedy* is discussed and its terms further defined. Beginning with a general description of the law of mistrial and retrial after *Kennedy,* Chief Judge Hatchett summarizes as follows:

> Ordinarily, the Double Jeopardy Clause does not bar retrial after the grant of a mistrial upon the defendant's motion. United States v. Torkington, 874 F.2d 1441, 1444 (11th Cir.1989). If the prosecution's actions compelled the defendant to move for a mistrial, however, the Double Jeopardy Clause does bar retrial. 874 F.2d at 1444. As we observed in Torkington, a defendant is compelled to move for a mistrial if the prosecution intentionally goaded the defendant into moving for a mistrial. 874 F.2d at 1444. The inquiry into the prosecution's intent is, for the most part, a matter to be inferred from objective facts and circumstances. See Oregon v. Kennedy, 456 U.S. 667, 679–80, 102 S.Ct. 2083, 2091–92, 72 L.Ed.2d 416 (1982) (Powell, J., concurring) ("Because 'subjective' intent often may be unknowable, I emphasize that a court—in considering a double jeopardy motion—should rely primarily upon the objective facts and circumstances of the particular case").

117 F.3d at 1303. Central to this proposition is the issue of prosecutorial intent. Specifically, I have found that the intent of the prosecutor in this case was to succeed in palming off Adria Jackson and her biographical baggage as Gracie Greggs, an operative of law enforcement. The analytical problem

is that the prosecutor's intent was to "get away with it" and remain unencumbered in her efforts. This differs from *Kennedy* -type cases, in which the prosecutor acts contrary to a rule, order, or the like but in a manner certain to be conspicuous—often in an open, notorious effort to influence the jury. The typical case includes no attempt by the prosecutor to achieve an ill-gotten verdict by furtive means.

The introduction of an element of furtiveness into the prosecutorial plan also presents problems with the word "goad" as it appears in *Kennedy*. How do you "intend" to "goad" someone with something about which you intend them to remain ignorant? Perhaps anticipating this definitional problem with *Kennedy* (if *Kennedy* is the answer to all mistrial/double jeopardy issues), Chief Judge Hatchett offered authority on the meaning of "goad":

> Webster's Third New International Dictionary defines "goad," in part as follows: "to drive, incite, or rouse." When used as a noun, Webster's indicates that a goad is "something that urges or stimulates like a goad" SPUR, STIMULUS. Webster's Third New International Dictionary 972 (3d ed.1976). In the past, we have suggested that goading may be found where the conduct of the government in bringing about the original mistrial is due to "gross negligence or intentional misconduct." United States v. Serra, 882 F.2d 471, 473 (11th Cir.1989).

117 F.3d at 1303.

This post-*Kennedy* observation is both crucial to the instant case and correct. Frankly, after *Kennedy*, "gross negligence" may have lost the Supreme Court's recognition as a form of "goading." But, even after *Kennedy*, *intentional* misconduct that, if known, is obviously sufficient to provoke a motion for mistrial by the defense constitutes "goading," especially if it intrudes into the unfettered exercise of a constitutional guarantee as essential as the right of confrontation. In this case, the prosecutorial plan was avowedly intentional, obviously adulterated, and irresistibly provocative of a motion for mistrial by the defense—a series of conclusions that fundamentally implicate the fifth amendment's immunity from double jeopardy. *United States v. Serra*, 882 F.2d 471 (11th Cir.1989); *United States v. Garza*, 603 F.2d 578 (5th Cir.1979); *United States v. Kessler*, 530 F.2d 1246 (5th Cir.1976); *United States v. Broderick*, 425 F.Supp. 93 (S.D.Fla.1977).

As a result of the prosecutorial plan in this case, the United States required the defense to present its case, forced the defendant to make his constitutional election whether to testify, secured the right to cross-examine the defendant under oath, and otherwise leveraged the defendant into the position of revealing his strategy, his theories, his evidence, and his cross-examination. All the while, the prosecutor harbored a secret. Viewed one way, the secret was that she had withheld so-called *Giglio* and other information that, if ever known to the defense, might discredit her featured witness. Viewed differently, the secret was that the prosecutor at any time could prompt a defense motion for a mistrial (and thereby accrue another chance at conviction) by revealing to the defense the truth about "Gracie Greggs." In either event, the trial was not conducted on equal footing because the prosecutor had the force of a lie at her disposal.

Twenty years ago, in *Lying: Moral Choice in Public and Private Life* (Vantage Books; New York, 1978), Sissela Bok explained the dynamics of personal dishonesty undertaken in presumed behalf of the public good. She warns of the dangers of lies supposedly motivated by some perception of duty, public good, or the like—the paternalistic lie grounded in a misguided sense of altruism:

> The excuse of altruism is often grounded in the liar's general belief in his own good will. "I mean well; therefore my lies will help" is as frequent a leap of the mind as: "I mean no harm; therefore my lies can't hurt." The possibilities of error about one's good intentions are immense. But even if these intentions *are* good, they are obviously no guarantee of a good outcome.

And so it is in this case. There is a bad outcome for the prosecutor. No conviction occurred. Time, effort, and money were wasted. A mistrial was declared. The indictment is under attack on double jeopardy grounds. A confidential informant has been

tainted. The *bona fides* of the office of an honorable and effective United States Attorney, Charles R. Wilson, are the subject of public questioning, as are the tactics of all other prosecutors. The AUSA is answering ethics questions from the Department of Justice and is subject to endangering reference to other authorities. All this because of an *ad hoc* deception.[6]

### CONCLUSION

By a course of intentional misconduct, discovered serendipitously by the defense during trial, the prosecution goaded the defense into moving for a mistrial. The defendant's fifth amendment immunity from double jeopardy precludes another trial and, therefore, requires the dismissal of the indictment.

The defendant's motion to dismiss the indictment is **GRANTED**.

---

6. On behalf of the public good, the court is entitled to the simple truth on all occasions. Stated from a different perspective, a duty of truthfulness is owed to the court by all citizens, especially by its officers, but not primarily because the court is empowered to sternly punish untruthfulness. Rather, a court is empowered to punish untruthfulness because citizens, especially the court's officers, owe the court an unwavering, solemn, and indelegable duty of truthfulness, including the qualities of honor, candor, and forthcoming disclosure.