[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 16, 2002
THOMAS K. KAHN
CLERK

_____

No. 00-15998

_____

D.C. Docket No. 99-08059-CR-WJZ

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GEORGE A. VALLEJO,
CLAUDIO ALEJANDRO CARMONA, et al.,

Defendants-Appellants.

_____

Appeals from the United States District Court for the
Southern District of Florida

_____

**(July 16, 2002)**

Before TJOFLAT, COX and BRIGHT[*], Circuit Judges.

BRIGHT, Circuit Judge:

_____

[*]Honorable Myron H. Bright, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

Appellants Claudio Carmona, George Vallejo, Anthony Gainer, and Anthony Genovese were charged with various criminal acts related to the extortion of three owners of a West Palm Beach nightclub. Carmona and Vallejo appeal their convictions and sentences for conspiracy in violation of 18 U.S.C. § 371; extortion in violation of 18 U.S.C. § 1951(a); mail fraud in violation of 18 U.S.C. § 1341; and money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1957. Gainer appeals his conviction and sentence for conspiracy in violation of 18 U.S.C. § 371 and extortion in violation of 18 U.S.C. §§ 1951(a) and 2. Genovese appeals his conviction for conspiracy in violation of 18 U.S.C. § 371 and mail fraud in violation of 18 U.S.C. § 1341.

We affirm each conviction and sentence with the exception of Anthony Gainer's sentence which we vacate and remand to the district court for resentencing consistent with this opinion.

## FACTUAL BACKGROUND

In May 1996, James Layson, George Desimone and Claudio Carmona purchased a restaurant business known as Ruby, Inc. Layson testified that Ruby, Inc. originally operated as a restaurant during the days and evenings and as a dance club called Bell Bottoms on the weekends. As the club became more popular, the owners decided to phase out the restaurant and purchase a less restrictive liquor

2

license so they could run Bell Bottoms solely as a dance club. Layson and Carmona purchased a new liquor license for approximately $50,000. Layson testified that, in late1996, Carmona expressed an interest in leaving the partnership. Around March 1997, Layson and Desimone secured new investors, Scott Jaspon and Craig Zuckerman, who agreed to purchase Carmona's share for $30,000. Carmona's name, however, remained on the liquor license because Layson owed him money from a previous personal loan. According to Layson, Carmona had no involvement with Bell Bottoms past March 1997.

Layson testified that on June 19, 1998, Carmona contacted Layson and informed him that he wanted to meet Layson at Bell Bottoms that evening. Layson assumed Carmona wished to collect the money Layson owed him and that Carmona would sign the papers to transfer the liquor license. When Layson arrived at the club that evening, two large men, later identified as Algernon Anderson and Gainer, grabbed him and held him against his will. A man Layson recognized as George Vallejo searched the contents of Layson's briefcase, while Anthony Jackson searched him for weapons. Layson testified that he saw Carmona sitting at a nearby table and tried to ask him what was happening and if this concerned the money he owed him. One of the men holding Layson repeatedly warned him to "shut up, don't move, don't talk," while another stood

3

next to him brandishing a "flapjack kind of weapon" in his hand. Layson noticed Mike Yetter, one of the bartenders at Bell Bottoms, sitting nearby.

Yetter arrived at Bell Bottoms before the above-described events took place. At trial, Yetter testified that when he arrived at Bell Bottoms, he noticed that the locks had been tampered with and turned around to call the police. Before he could do so, a man Yetter did not recognize told him that his boss was inside. As Yetter moved towards the door, the man shoved him through the door where two other men grabbed him and held him off the ground. Yetter testified that Jackson held a machete to his throat while Vallejo ordered the two men to frisk him for weapons. After searching him for weapons, one of the men escorted Yetter to a hallway in the back of the club where he was told to sit. Layson arrived a few minutes later.

Layson testified that he eventually sat down at the table with Carmona and asked again if this was about the money he owed Carmona. Carmona stated that he was upset at the recent radio advertisement for Bell Bottoms, which, according to Carmona, showed disrespect for a nightclub called Darkside that Carmona and his brother, Fernando, owned. Carmona asked Layson to have Jaspon and Desimone meet them at Bell Bottoms. At that point, Layson stated that he left Bell Bottoms

4

and walked next door to Montana's, a restaurant in which he had an interest and was scheduled to open up that evening.

Layson testified that he did not know whether to call the police because he feared that Carmona or someone associated with Carmona would seriously harm or kill him or his family. Jaspon and Desimone arrived at Bell Bottoms while Layson and Yetter were next door at Montana's. Layson then joined Jaspon, Desimone and Carmona at Bell Bottoms. Layson and Jaspon testified that Carmona informed them that they were to sign the club over to him and he in return would pay each of them $1,000 per month for thirty months. Layson testified that Carmona and Vallejo told Jaspon, Desimone, and Layson that the papers had to be signed that night.

Layson, Jaspon and Desimone left to discuss their options at Montana's. While all of this was going on, Bell Bottoms' employees began to arrive for work. Carmona told the employees that they were fired. Carmona testified that he and Vallejo had arranged for a new staff to come in and run Bell Bottoms that evening.

Layson and Jaspon testified that they agreed to sign the documents transferring ownership of Bell Bottoms to Carmona because they feared for their lives and personal safety. They each signed a promissory note and a bill of sale. Layson additionally signed a third document that purported to transfer Bell

Bottoms' liquor license to Carmona. Anthony Genovese, a notary commissioned in the State of Florida, notarized the documents. Layson and Jaspon testified that Genovese notarized some of the documents before they were signed. Carmona later realized that the documents were deficient. He created a new set of documents, and forged Layson, Desimone and Jaspon's signatures. Genovese also notarized these documents.

Carmona and Vallejo opened a nightclub called "Club Alibi" at the location formerly occupied by Bell Bottoms. On June 22, 1998, three days after the takeover, local law enforcement closed Club Alibi because it did not have the required occupational licenses. Approximately one week after the takeover, Carmona submitted documents, notarized by Genovese, to Consolidated Capital seeking a $38,000 loan. As collateral, Carmona put up the liquor license that Layson had been forced to sign over on June 19, 1998. On June 30, 1998, Carmona submitted an application, notarized by Genovese, to transfer the liquor license to his name. Between June 30, 1998 and July 8, 1998, various documents related to the loan and fraudulent transfer of ownership of Bell Bottoms were mailed via United States Parcel Service and United States Postal Service.

In April 1999, police arrested Carmona, Vallejo, Genovese, Anderson and Gainer. Gainer admitted that he was present at Bell Bottoms on June 19, 1998, and

6

that Vallejo had called him earlier that evening to tell him that they were going to open the nightclub. Gainer also stated that his physical presence made Layson, Desimone and Jaspon very nervous, and he believed that was why they agreed to the takeover.

During the prosecution's case, Detective Frazier, a government witness, made an improper statement regarding appellants' post-arrest silence. The district court granted appellants' motion for mistrial and immediately scheduled jury selection for a new trial.

Appellants subsequently waived their right to trial by jury and agreed to proceed with a bench trial. The bench trial began on February 17, 2000, with the government resting its case later that day. The appellants made Rule 29 motions for acquittal at the close of the government's case and prior to closing argument, which the district court denied.

The district court found Carmona, Vallejo, Gainer and Genovese guilty, but acquitted Anderson of all counts. The district court found Carmona guilty of conspiracy, extortion, mail fraud and money laundering and sentenced him to 60, 120, and 168 months imprisonment to be served concurrently. The court also placed him on supervised release for three years. The district court sentenced Vallejo to 60, 120, and 144 months imprisonment to be served concurrently and

placed him on supervised release for three years. The district court found Genovese guilty of conspiracy and mail fraud and sentenced him to twenty-four months incarceration for each count to be served concurrently and three years supervised release. Finally, the district court found Gainer guilty of conspiracy and extortion and sentenced him to sixty and ninety-six months to be served concurrently, and three years supervised release. The district court further ordered all four defendants to jointly and severally pay restitution in the amount of $345,000.

## ANALYSIS

### I.

*A.    Double Jeopardy*

On appeal, appellants argue that the Double Jeopardy Clause barred their retrial because the government's conduct left them with no choice but to request a mistrial. The Double Jeopardy Clause does not bar retrial after the grant of a defendant's motion for mistrial unless the prosecution intentionally goaded the defendant into moving for a mistrial. United States v. Fern, 155 F.3d 1318, 1324 (11th Cir. 1998). Appellants contend that the district court erred by finding that the government did not intentionally precipitate a mistrial in order to gain a better opportunity to convict them in a second trial.

In considering a motion for double jeopardy, the trial court should rely on the objective facts and circumstances of the particular case. Id. (citing Oregon v. Kennedy, 456 U.S. 667, 679-80 (1982) (Powell, J., concurring)). We review the district court's factual finding for clear error and its application of the law to those facts *de novo*. Id. The court's determination of the prosecutor's intent is a finding of fact. Id. We must decide whether the district court's determination that the prosecution did not intentionally goad the defendants to move for a mistrial was clearly erroneous.

When it granted the defendants' motion for mistrial, the district court stated for the record that it accepted the prosecutor's representation that he was surprised by Detective William Frazier's improper comments on the appellants' post-arrest

silence[1] and did not intend to cause a mistrial.  The court also summarily denied

defendants' motion to dismiss the indictment on double jeopardy grounds.

---

[1]Frazier gave the following testimony in response to the prosecutor's questions about why and how Frazier came to question Anthony Jackson:

> [Prosecutor]: In any of the interviews which you have participated with Tony Jackson on, did he ever ask not to be prosecuted by the government?
> [Frazier]: No, he never did.
> . . . .
> [Prosecutor]: Did he seem concerned about being prosecuted?
> [Frazier]: Well, he was petrified.
> [Prosecutor]: Can you tell the ladies and gentlemen of the jury why you elected not to arrest Tony Jackson up until this point in time right now?
> [Frazier]: Yeah, I can.  I was looking for cooperation from the defendants' side of the camp.  That's why I didn't arrest him.  Up until that time I met Mr. Jackson I hadn't reached or--I hadn't obtained any kind of cooperation from their side, excuse my language, of the camp--

Carmona moved for a mistrial claiming that Frazier's testimony, about no cooperation "from their side," amounted to an improper comment of post-arrest silence.  Instructing the prosecutor to continue, the district court notified the parties that the motion would be considered during the lunch recess.  The prosecutor stated for the record that he believed Frazier intended to say the word corroboration rather than cooperation.  The prosecutor resumed questioning Frazier:

> [Prosecutor]: Now, Detective Fraser [sic], up until this point in time you had interviewed all the victims in the case?
> [Frazier]: Yes, I had, sir.
> [Prosecutor]: So you had their view of the events?
> [Frazier]: Sure.
> [Prosecutor]: Did you want to obtain corroboration of their version of the events?
> [Frazier]: Yes, sir.
> . . . .
> [Prosecutor]: Did you want to obtain corroboration of some sort?
> [Frazier]: Period, yes, sir, I did.
> [Prosecutor]: Okay.  From whose perspective?
> [Frazier]: The defendants.

10

On appeal, appellants attempt to demonstrate that Detective Frazier's improper comments on the appellants' post-arrest silence did not surprise the government. They point to Frazier's testimony during the bench trial that he had told the prosecutor what his "answer would be as to why [Frazier] didn't arrest Anthony Jackson." Based on this statement, appellants contend that the prosecutor must have known that Frazier would make improper comments.

The government responds that the district court did not clearly err in determining that the prosecutor did not intend to provoke a mistrial because Frazier did not give the response expected by the prosecutor. In support of this position, the government points to Frazier's bench trial testimony where he clarifies that his discussions with the prosecutor focused on the fact that Jackson had not been arrested because he had been cooperative from the beginning of the investigation. Accordingly, Frazier's testimony offers no basis for concluding that the prosecutor questioned him with the intent of provoking a mistrial.

Under Oregon v. Kennedy, only deliberate prosecutorial misconduct implicates double jeopardy principles. 456 U.S. at 678. Just after granting the motion for mistrial in this matter, the district court made a clear finding that the government had not engaged in gross negligence or intentional misconduct:

11

> The court finds that the conduct of the government in bringing – the court accepts the representation by the prosecutor that this answer was a surprise to the prosecutor.
>
> So it is really not the conduct of the prosecutor, although it is the government's witness. So the court finds that the conduct of the government through the witness, if you will, in bringing about this mistrial does not constitute gross negligence or intentional misconduct.

Appellants have not presented sufficient evidence to show clear error in the district court's determination that the prosecutor did not intentionally "goad" appellants to move for mistrial. The Double Jeopardy Clause did not bar appellants' retrial.

B.    *Discovery Violations*

Appellants argue that the prosecutor violated Giglio v. United States, 405 U.S. 150 (1972), and Brady v. Maryland, 373 U.S. 83 (1963), by failing to provide the defense with the correct criminal history record ("rap sheet") for Anthony Jackson, a government witness. In January 2000, while preparing for trial, the prosecution discovered that it had provided to the defense the rap sheet for another Anthony Jackson. However before the trial began, the prosecutor delivered the correct rap sheet with a letter explaining the error. Nonetheless, appellants argue that this error prevented the defense from cross-examining Jackson on any concessions or benefits he received from the government in exchange for his testimony. They assert that, had the government not misled them concerning the

12

identity of the witness, the outcome of the trial and sentencing would have been different.

We review the district court's denial of a motion for new trial based on newly discovered evidence for abuse of discretion. United States v. Obregon, 893 F.2d 1307 (11th Cir. 1990). Similarly, a district court's denial of a motion for new trial based on a Brady violation is reviewed for abuse of discretion. United States v. Fernandez, 136 F.3d 1434, 1438 (11th Cir. 1998).

In order to succeed on a Giglio challenge, the defendant must demonstrate that the prosecutor "knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material." United States v. Dickerson, 248 F.3d 1036, 1041 (11th Cir. 2001), petition for cert. filed, (U.S. June 25, 2001) (No. 01-10864) (quotations omitted).

To establish a Brady violation, the defendant must show that (1) the government possessed favorable evidence to the defendant; (2) the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different. United States v. Meros, 866 F.2d 1304, 1308 (11th Cir. 1989).

13

At sentencing, appellants argued that the prosecution intentionally kept the correct information about Jackson from the defense. Appellants moved the district court to grant a new trial on the basis of newly discovered evidence. The district court denied the motion on the grounds that the information was public record and the appellants failed to show that they exercised due diligence in discovering it. Furthermore, the district court ruled that even if the evidence had been presented during the bench trial, it would not have affected the outcome of the court's decision.

We conclude that the district court did not abuse its discretion by denying Carmona's and Vallejo's motion for new trial based on discovery violations. The appellants failed to show that the witness perjured himself or that the prosecutor failed to correct false testimony. Additionally, the evidence withheld by the government could have been obtained through reasonable diligence.

B.      *Prosecutorial Misconduct Before the Grand Jury*

For the first time on appeal, appellants argue that this court should dismiss the indictment based on improper prosecutorial conduct that occurred before the grand jury. They allege that the prosecutor persistently misled the grand jury by stating that Carmona had no legal right or interest in Bell Bottoms. Appellants further argue that the derogatory statements made by Desimone and Detective

Frazier about Carmona and his family improperly influenced the grand jury's decision to indict the appellants.[2]

Generally, we review for abuse of discretion the denial of a motion to dismiss an indictment. United States v. Pielago, 135 F.3d 703, 707 (11th Cir. 1998). However, because appellants raise this issue for the first time on appeal, we review it for plain error. United States v. Olano, 507 U.S. 725, 731-32 (1993). Under this standard, there must be an error that is plain and that affects substantial rights. Id. When these three factors are met, the courts of appeal may then exercise their discretion and correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id. at 736.

---

[2]Several grand jury witnesses stated or implied that Carmona had no legal right or interest in Bell Bottoms. Additionally, the prosecutor asked Desimone about Carmona's reputation in the community and about his family's reputation with respect to violence. Desimone replied that "I know they are big guys. They won't take any crap that's for sure." On that same day a grand juror asked Detective Frazier the following question regarding a statement made by Gainer:

| [Juror]: | When I hear somebody say family that reminds me of the mob. Is this true? |
| [Frazier]: | Yes, sir, it does. That's the connotation it gives me also. |

In response to Frazier's comment, the prosecutor stated the following:

| [Prosecutor]: | I should note for the record, however, that your determination of probable cause, ladies and gentlemen, should be determined solely on the basis of your evaluation of the evidence before you, and you know, whatever you may think about what Mr. Gainer meant by that statement shouldn't be used to form a basis of opinion solely based on prejudice. |

Under <u>Bank of Nova Scotia v. United States</u>, 487 U.S. 250, 251 (1988), the district court must ask whether the error before the grand jury "'substantially influenced the grand jury's decision to indict,' or [whether] there is 'grave doubt' that that decision [to indict] was free from such substantial influence [of such violations]." <u>Id.</u>

Appellants' contention that the prosecutor misled the grand jury about whether Carmona had any interest in Bell Bottoms or the liquor license is immaterial. Whether Carmona had an interest in the club and the license, has no bearing on whether he extorted the owners into giving up their interests in the club. Appellants also fail to make any connection between Carmona's alleged interest in Bell Bottoms and how the lack of that information might have substantially influenced the grand jury's decision to indict.

Appellants argue that the derogatory statements made in reference to Carmona and his family improperly influenced the grand jury's decision to indict. This argument is also without merit. The derogatory statements concerning Carmona and his family's reputation were not made by the prosecutor; they were made by Desimone, a witness and a victim. Desimone's statements demonstrated his fear that something would happen to him if he did not sign the club over that evening. The indictment charged Carmona with extortion. A crucial element in

16

proving extortion is the victim's fearful state of mind. <u>United States v. Grassi</u>, 783 F.2d 1572, 1578 (11th Cir. 1986). <u>Grassi</u> defined extortion as obtaining "property from someone else with his consent, but whose consent is brought about or induced by the wrongful use of actual or threatened force, violence, or fear. . . . '[F]ear' means a state of anxious concern, alarm or apprehension of harm, and it includes fear of economic loss as well as fear of physical violence." <u>Id.</u> at 1577. Desimone's comment demonstrated that he was fearful that he would be physically harmed if he did not consent to Carmona's takeover.

Additionally, Detective Frazier's statement that the appellants were similar or analogous to the mob can hardly be seen as so prejudicial as to substantially influence the grand jury's decision to indict. As stated above, the appellants were charged with and convicted of extortion. The reputations of the appellants and their families are certainly relevant as to whether the victims were "induced by wrongful use of actual or threatened force, violence, or fear" to sign over the nightclub. 18 U.S.C. § 1951(b)(2). Furthermore, following Frazier's comment, the prosecutor instructed the grand jury that their determination should be based solely on the evidence, not on what they think about the appellants.

17

For the foregoing reasons, the district court's failure to dismiss the indictment based on the prosecutor's conduct before the grand jury does not constitute plain error.

*C.      Effect on Interstate Commerce*

Gainer maintains that the government failed to provide sufficient evidence to establish that the extortion affected interstate commerce. Considering the evidence in the light most favorable to the government, we review *de novo* whether sufficient evidence was presented at trial to support appellants' convictions. United States v. Guerra, 164 F.3d 1358, 1359 (11th Cir. 1999).

The Hobbs Act criminalizes conduct that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do." 18 U.S.C. § 1951(a). The Supreme Court explained that the Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence. The Act outlaws such interference 'in any way or degree.'" Stirone v. United States, 361 U.S. 212, 215 (1960). Furthermore, this court held in United States v. Gray, 260 F.3d 1267, 1272 (11th Cir. 2001), that "the jurisdictional

18

requirement may be met simply by showing that the offense had a minimal effect on commerce."

In United States v. Paredes, 139 F.3d 840, 844 (11th Cir. 1998), the defendants robbed two local convenience stores of beer, cigarettes, and no more than $170 in cash. We concluded that although the robberies were made from "two local convenient [sic] stores that are not connected to out-of-state stores," evidence showed that "*some* merchandise was manufactured out of state." Id. We held this minimal effect on interstate commerce was sufficient to satisfy a Hobbs Act conviction. Id. at 844-45.

Testimony at trial established that Bell Bottoms purchased liquor and beer locally in Florida, but that these liquors were manufactured in other states and foreign countries. A beer distributor employee testified that from March 1997 through June 1998 Bell Bottoms regularly purchased beer manufactured outside the state of Florida. Layson testified that Bell Bottoms purchased no alcohol between June 19, 1998 and mid-October 1998. Thus, at a minimum, beer purchases from out of state were affected after the June 19, 1998 incident.

We conclude that the government presented sufficient evidence for a reasonable factfinder to conclude that the extortion affected interstate commerce.

19

**II.**

Appellants raise various challenges to the sentencing enhancements imposed by the district court under the Sentencing Guidelines. We review the district court's factual findings for clear error and its application of the Guidelines to those facts *de novo*. United States v. Cover, 199 F.3d 1270, 1274 (11th Cir. 2000).

*A.     Physical Restraint*

Carmona, Vallejo and Gainer argue that the district court improperly imposed a two-level enhancement pursuant to § 2B3.2(b)(5)(B) because the evidence at trial did not establish that any person was physically restrained during the commission of the crime. They assert that the victims' movements between the club and the restaurant next door, demonstrates they were not physically restrained as defined by the Guidelines.

A two-level enhancement is appropriate "if any person was physically restrained to facilitate commission of the offense or to facilitate escape." U.S.S.G. § 2B3.2(b)(5)(B). Physical restraint is "the forcible restraint of the victim such as by being tied, bound, or locked up." U.S.S.G. § 1B1.1, cmt. n.1(h).

Although we have not addressed the scope of "physical restraint" within the context of § 2B3.2(b)(5), which pertains to extortion by force or threat of injury or

serious damage, we have addressed the scope of "physical restraint" within the context of § 2B3.1(b)(4), which pertains to robbery. In United States v. Jones, 32 F.3d 1512, 1519 (11th Cir. 1994), we held that "[a]lthough no threats were made, the obvious presence of handguns ensured the victims' compliance and effectively prevented them from leaving the room for a brief period . . . ."

Here the co-conspirators physically restrained their victims. Yetter and Layson both testified that two large men grabbed them and held them against their will. This constitutes physical restraint because the victims had no alternative but to comply and were effectively prevented from leaving the club, even if only for a short time. The fact that the victims were eventually free to leave does not mean that they were not physically restrained. See Jones, 32 F.3d at 1519 ("Even though the vault door was not locked and the victims were able to free themselves easily, the victims were forced to comply.") (citing United States v. Schau, 1 F.3d 729, 730 (8th Cir. 1993)).

The record adequately supports the district court's findings.

B.      *Threat of Bodily Injury*

Carmona, Vallejo and Gainer also assert that there was no basis in the record to conclude that any real or perceived threats took place against the owners of the

nightclub; therefore, the district court improperly applied a two-level enhancement for express or implied threat of bodily injury pursuant to § 2B3.2(b)(1). They contend that the use of the machete cannot be imputed to them because it was an "aberrant, unexpected and independent act" that was not reasonably foreseeable.

Section 2B3.2(b)(1) provides for a two-level increase if "the offense involved an express or implied threat of death, bodily injury, or kidnapping." U.S.S.G. § 2B3.2(b)(1). Commentary to this section states that "[e]ven if the threat does not in itself imply violence, the possibility of violence or serious adverse consequences may be inferred from the circumstances of the threat or the reputation of the person making it." U.S.S.G. § 2B3.2, cmt. n.2. Additionally, co-conspirators are responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity . . . ." U.S.S.G. § 1B1.3(a)(1)(B).

The evidence, specifically the testimony of Layson and Yetter, sufficiently supports the two-level increase for threat of bodily harm. The government's assertion that threats of bodily injury were "part and parcel" of a violent extortion scheme in this case is convincing.

The record reflects that two men grabbed Yetter and another held a machete to his throat after he walked into the club. Yetter stated that he was "[p]retty

22

scared . . . [he] thought [he] was going to end up getting killed . . . ." Layson testified that when he indicated that he would not sign the club over, Desimone urged him to sign the papers stating that "you [Layson] don't know how bad these guys are. You don't know what they will do." Layson testified that Desimone informed him of previous acts of violence committed by Claudio Carmona and Fernando Carmona. He further testified that he signed the papers and did not call the police that night because he was afraid that the appellants would come to his home and kill him or his family. Based on the evidence and the reputation of the appellants, the district court did not clearly err by finding that the victims were threatened with death or serious bodily injury.

## C. *Brandishing a Dangerous Weapon*

Carmona and Vallejo contend that the district court erred by applying a three-level enhancement for brandishing a dangerous weapon pursuant to § 2B3.2(b)(3)(A)(v), arguing that it was not reasonably foreseeable that any weapon would be present.

A three-level increase is applied to a defendant's sentence "if a dangerous weapon was brandished or possessed" during the commission of extortion by force or threat of injury. U.S.S.G. § 2B3.2(b)(3)(A)(v).

23

Carmona and Vallejo do not challenge the presence of a dangerous weapon, only whether it was reasonably foreseeable that one would be used during the commission of the offense. Carmona and Vallejo deliberated and carried out the forced sale of a nightclub from its owners. We cannot accept the argument that they had no reason to foresee that a dangerous weapon might be employed to force the victims to give up ownership of their business. As such, the district court did not clearly err by enhancing Carmona's and Vallejo's sentences for brandishing a dangerous weapon.

D. *Obstruction of Justice*

Carmona argues that the district court improperly applied a two-level enhancement for obstruction of justice pursuant to § 3C1.1. The Sentencing Guidelines provide for a two-level enhancement if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. The district court must make an independent factual finding that the defendant gave perjured testimony on a material matter in order to apply the enhancement. United States v. Jones, 32 F.3d 1512, 1519 (11th Cir. 1994). It is preferable that the district court make specific findings as to each instance of obstruction by identifying the materially false statements individually.

24

United States v. Arguedas, 86 F.3d 1054, 1059 (11th Cir. 1996). It is sufficient, however, that the district court makes "a general finding of obstruction of justice that encompasses all of the factual predicates of perjury." Id.

At sentencing, the government identified eight false statements that Carmona allegedly made during the trial. The district court found that two of those statements were false and material; therefore, a two-level enhancement for obstruction was appropriate. One of the statements concerned whether or not Carmona received the $30,000 for his interest in Bell Bottoms. Carmona testified that he never received the money. The other statement involved whether Carmona told Jackson not to allow the victims to leave the nightclub until the "meeting" was over.

On appeal, Carmona argues that the two statements relied upon by the district court were neither material nor false. He asserts that whether or not he received the money for his share of Bell Bottoms is irrelevant to any element of the offense and, thus, not material. Carmona further contends that the statement made to Jackson pertained to the staff that he had arranged to come in and run the nightclub that night, not the victims.

The district court's finding that Carmona's testimony was false and related to a material matter was not clearly erroneous. Both Layson and Jaspon testified

25

that Carmona received three installments totaling $30,000 for his share, thereby refuting Carmona's statement that he had not received any compensation for his interest in Bell Bottoms. Furthermore, Jackson testified that Carmona stated that no one was to leave until the meeting was over. This testimony directly contradicts Carmona's contention that he never told anyone to stop the owners from leaving the nightclub. Because the district court made the required factual findings that Carmona perjured himself on the witness stand, the two-level enhancement for obstruction of justice was not clearly erroneous.

E. *Role in the Offense*

Vallejo argues that the evidence presented to the district court does not support a finding that he was an organizer or leader of a criminal enterprise involving five or more participants within the meaning of § 3B1.1.

Section 3B1.1(a) provides for a four-level enhancement to the base offense level of any defendant who "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The Guidelines set forth several factors for the sentencing court to consider in determining whether the defendant served a leadership or organizational role. U.S.S.G. § 3B1.1, cmt. n.4. These factors include: (1) exercise of decision-making authority, (2) nature of participation in the commission of the offense, (3) recruitment of accomplices, (4)

26

claimed right to a larger share of the fruits of the crime, (5) degree of participation in planning or organizing the offense, (6) nature and scope of the illegal activity, and (7) degree of control and authority exercised over others.  Id.

The defendant does not have to be the sole leader or kingpin of the conspiracy in order to be considered an organizer or leader within the meaning of the Guidelines.  United States v. Revel, 971 F.2d 656, 660 (11th Cir. 1992). Furthermore, "[b]ecause the district court must interpret the factors stated in the commentary, and must exercise its best judgment as to the application of the facts to these standards, its decision is entitled to one of deference on appeal."  Id. (quotations omitted).

The evidence at trial established that Vallejo:  (1) gave orders to others involved with the conspiracy; (2) arranged for all of the security at the club on June 19, 1998, and planned on handling the security after Carmona took control of the club; and (3) arranged for the notary to sign the papers that night.  Jackson testified that Vallejo was one of his bosses, along with Carmona and Carmona's brother. Moreover, both Vallejo and Carmona arranged and coordinated who would be present on June 19, 1998.  The district court's finding that Vallejo acted as an organizer or leader under section 3B1.1 was not clearly erroneous.

F.    Multi-object Conspiracy

27

When a defendant is convicted of conspiracy, the sentencing court is to apply the offense level that it would have applied had that defendant been convicted of the substantive offense on which the conspiracy charge is based. See U.S.S.G. § 2X1.1(a); § 1B1.2(d) ("A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit."). Where a count charges a conspiracy to commit multiple offenses, the Guidelines caution:

> Particular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense.

U.S.S.G. § 1B1.2(d), cmt. n.4.

This court has construed the words "were it sitting as trier of fact" to mean that "the court must find beyond a reasonable doubt that the defendant conspired to commit the particular object offense." United States v. McKinley, 995 F.2d 1020, 1026 (11th Cir. 1993). Again in United States v. Ross, 131 F.3d 970, 989 (11th Cir. 1997), we held that, where a count charges a conspiracy to commit more than

28

one offense, the district court must find beyond a reasonable doubt that the defendant conspired to commit that particular offense conduct in order to apply the corresponding offense level as found in the Sentencing Guidelines. 131 F.3d at 989. Likewise, in United States v. Farese, 248 F.3d 1056, 1060-61 (11th Cir. 2001), we vacated the defendants' sentences holding that the district court erred in applying a preponderance of the evidence standard, rather than finding that the defendants conspired to commit money laundering beyond a reasonable doubt. Id.

Gainer argues that the district court erred in sentencing him on the basis of a multi-object conspiracy because it did not find beyond a reasonable doubt that he conspired to commit each object offense of the conspiracy.

The trial court found Gainer guilty of one count of conspiracy in violation of § 371 and one count of extortion in violation of § 1951(a). The indictment alleged and the government argued at trial that there were four objects of the § 371 conspiracy: extortion; mail fraud; § 1956(a) money laundering; and § 1957 money laundering. When the trial court announced its finding of Gainer's guilt, it made no mention of any of the four objects of the conspiracy.

Prior to sentencing, a probation officer prepared a Presentence Investigative Report in which she factored all four objects of the conspiracy into Gainer's offense level. Pursuant to the grouping guidelines, she grouped the substantive

29

extortion count and the conspiracy to commit extortion count together, and then grouped the remaining objects of the conspiracy, mail fraud and money laundering, into a second group. Under this scheme, Gainer's offense level increased by one-level, pursuant to § 3D1.4.

At sentencing, Gainer objected to the one-level adjustment, arguing that he was convicted of conspiracy to commit extortion, not conspiracy to commit mail fraud and money laundering. Therefore, in order for the district court to sentence him under a multi-object conspiracy, Gainer asserted that the court must find that he committed each object of the conspiracy beyond a reasonable doubt. The government acknowledged at sentencing, and again in its brief to this court, that the standard for sentencing based on the substantive objects of a conspiracy is proof beyond a reasonable doubt.

Prior to ruling on Gainer's multiple sentencing objections, including his multi-object conspiracy objection, the district court adopted a general preponderance of the evidence standard for all of its findings and then proceeded to overrule Gainer's objection:

> The court makes the following findings by a preponderance of the evidence.
>     . . . .

Regarding Mr. Gainer's objection to the improper grouping or double counting, the court will deny that objection. The court adopts the comments of the government, as well as the probation officer as its reasons in denying that objection.

Shortly after making these statements, the court evidently clarified its ruling by stating that it "adopts the comments of the government as set forth in its omnibus response and the comments of the probation officer as set forth in the various addenda as additional reasons of the court for making its rulings." Review of the record, however, reveals that the Government's Omnibus Response to the Presentence Investigative Reports, filed on August 4, 2000, pertains only to Carmona, Vallejo and Genovese. The government had filed a response to Gainer's individual sentencing objections on June 26, 2000.

The government's response to Gainer's multi-object conspiracy objection presented two arguments[3] for why Gainer should be found liable for all four objects of the conspiracy, but ultimately concludes, "This Honorable Court did, of

---

[3]First, the government argues that the conspiracy count is "in essence subsumed" in the extortion count because § 371 conspiracy carries only a five-year maximum imprisonment whereas the extortion count has a twenty-year maximum. We can dismiss this argument because Gainer's objection is based on the one-level increase in his offense level due to grouping the conspiracy and extortion counts, not a higher maximum penalty.

Second, the government argues that Gainer should be sentenced based on the mail fraud and money laundering objects because under co-conspirator liability articulated in Pinkerton v. United States, 328 U.S. 640 (1946), there is ample evidence to prove that the mail fraud and money laundering should have been reasonably foreseeable to Gainer.

31

course, sit as a trier of fact upon the case, and is thus the only party capable of resolving the application of this section." Similarly, the probation officer's addendum suggests that Gainer's participation in the extortion led to the mail fraud and money laundering, but is powerless to resolve the issue: "This issue is not resolved." Both the government and the probation officer tacitly recognized that the district court was required to make findings beyond a reasonable doubt on each of the objects of the conspiracy.

On appeal, the government argues that, because the district court both acted as the trier of fact and imposed the sentence, the court's decision to base Gainer's sentence on a multi-object conspiracy for mail fraud and money laundering necessarily implies that those objects were proved beyond a reasonable doubt.

We decline to adopt the government's argument for two reasons. First, it is not clear that the district court applied the proper standard of proof. The court adopted a general preponderance standard when ruling on Gainer's multiple sentencing objections and never mentioned proof beyond a reasonable doubt.[4] We will not assume that the district court applied the proper standard in the absence of any explicit statement by the court. Our precedent makes clear that "failure to

---

[4]The government urges us to accept that the district court knew the proper standard because defense counsel argued the proper standard in its oral objection at sentencing.

32

apply the proper standard of proof at sentencing *compels* us to vacate the appellant[']s sentence[] and remand this case to the district court for resentencing." Farese, 248 F.3d at 1061 (emphasis added).

We also reject the government's argument that "what happened at sentencing reflects the court's view about what the government had proven at trial." Again, we will not speculate about the trial court's findings. The Guidelines and the precedent in this circuit provide sentencing courts with a specific framework for sentencing a defendant on the objects of a conspiracy. Because there is nothing in the record that clearly indicates the district court made findings in accordance with these provisions, we vacate Gainer's sentence and remand for resentencing.

**AFFIRMED IN PART and REVERSED IN PART.**