[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 11, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-11047
Non-Argument Calendar

_____

D. C. Docket No. 06-80095-CR-DTKH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LUCKY MATA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(February 11, 2009)**

Before CARNES, WILSON and FAY, Circuit Judges.

PER CURIAM:

Lucky Mata appeals his convictions arising out of a tax fraud conspiracy, arguing that the district court erred by denying his motion to dismiss the indictment on double jeopardy grounds. Specifically, he contends that the government could not re-try him after the district court granted Mata a mistrial at his first trial because the prosecutor intentionally "goaded" Mata into moving for the mistrial. For the reasons set forth below, we affirm.

**I.**

A federal grand jury returned a second superceding indictment against Mata, charging him with: conspiracy to file false currency transaction reports, defraud and obstruct the Internal Revenue Service ("IRS"), and obstruct a federal grand jury, in violation of 18 U.S.C. §§ 371 and 1512(c) and 31 U.S.C. § 5324(a)(2) (Count One); six counts of filing false currency transaction reports, in violation of 31 U.S.C. §§ 5313(a), 5324(a)(2), 5322(b), and 18 U.S.C. § 2 (Counts Two through Seven); two counts of filing false federal payroll tax returns, in violation of 26 U.S.C. § 7206(1) (Counts Eight and Nine); and obstructing a federal grand jury, in violation of 18 U.S.C. § 1512(c)(2) (Count Ten).

The indictment alleged that, as the President and owner of Kodiak Construction & Management, Inc. ("Kodiak"), Mata issued large checks that purported to be for the payment of subcontractors' invoices. However, the

2

indictment alleged that Mata hired individuals to pose as subcontractors, cash the checks, and return the proceeds to Mata, who would then use the proceeds to pay Kodiak employees. Thus, the indictment alleged that the subcontractor invoices were "fraudulent" and were used only to "disguise the payment of cash wages to the employees of Kodiak." This scheme allowed Mata to avoid withholding federal payroll taxes.

On the second day of Mata's first trial, the government called James Donovan, who testified as follows. Mata hired Donovan, a certified public accountant ("CPA"), to prepare financial statements and tax returns for Kodiak so that Mata could expand the business. While Donovan was engaged in this process, he received a grand jury subpoena from the IRS related to James Monahan, one of Kodiak's alleged subcontractors. Upon investigation, and after noticing that Monahan consistently received large checks from Kodiak every week, Donovan asked Mata for documentation confirming that Monahan was in fact a subcontractor. Mata did not provide Donovan with any such documentation, but rather informed Donovan that Monahan was a "check casher" who returned the proceeds to Mata so that he could pay his employees. Donovan then contacted a tax attorney, and Mata thereafter discharged Donovan as his CPA.

On cross-examination by Mr. White, Mata's defense attorney, Donovan

reiterated that Mata told him that Monahan was a check casher and that Mata did not provide Donovan with any substantial documentation confirming that Monahan was a subcontractor. Specifically, Donovan testified that "there was no contract, I can assure you of that. I don't recall, there may have been an invoice or two, but there was not any substantial amount of data that I could say, okay, IRS here is your stuff." Despite the lack of documentation on Monahan, Donovan nonetheless prepared a package of documents to send to the IRS in order to attempt to comply with the subpoena.

Donovan testified that, a few weeks before the trial began, and in response to a subpoena he received from White, Donovan allowed White to come to his office and inspect his records. White then introduced documents related to Monahan that White allegedly found in Donovan's files. Donovan responded that he had never seen the documents before: "I have never seen this many documents [related] to Monahan. Never. No, sir, we never sent this many invoices, to the best of my recollection, to the IRS. This information was not in the file." Donovan identified a copy of the cover letter that he wrote to the IRS, and he pointed out that, while his letter mentioned copies of checks and a certificate of liability insurance, "it [did] not mention invoices." In this respect, Donovan testified that, if the invoices had been in his file, he would have mentioned them in his cover letter and sent

4

them to the IRS, as "one of the goals in trying to comply with an IRS subpoena is to provide as much information as possible."

At that point in Donovan's testimony, White requested a sidebar. White told the court that, "as an officer of the court," he had copied the Monahan invoices from Donovan's original file. White therefore requested that Donovan return the following day with his original file, and the court subsequently instructed Donovan to do so.

The next day at trial, White called Donovan as a defense witness, and Donovan acknowledged that the Monahan invoices that White had shown him the day before were contained in Donovan's file. However, Donovan repeated that he had never seen them before, had no idea how they got in his file, and would have sent them to the IRS if he had known that they were in the file.

On cross-examination by the government, Donovan testified that he knew, upon receiving the subpoena, that the IRS's "entire investigation was these invoices, if they existed." Donovan reiterated that he had never seen the Monahan invoices before and that, because that type of information went to the heart of the investigation, he would have remembered those documents and provided them to the IRS if he had seen them. Donovan then agreed with the prosecutor's suggestion that the invoices could have appeared in his file "immediately before

5

the trial." After the prosecutor engaged in a line of questioning suggesting that

Mata had created the invoices on his typewriter, the following exchange occurred:

GOVERNMENT: Prior to this trial, did anybody from Kodiak's office including Mr. White have unfettered access to these original records?

DONOVAN: Yes.

GOVERNMENT: When did that happen and where?

DONOVAN: Mr. White issued a subpoena and c[a]me into my office, and I sat down with him and brought him to a rear office of mine, a private office and gave him a box, this whole box, and he wanted access to a copy machine. I gave him access to a copy machine and he made copies.

GOVERNMENT: You didn't sit there and watch him, correct?

DONOVAN: No, sir.

GOVERNMENT: Nobody with him?

DONOVAN: No, sir.

GOVERNMENT: He didn't bring an investigator or witness with him?

DONOVAN: No.

GOVERNMENT: Neither you nor anybody else from your office sat there?

DONOVAN: No.

6

GOVERNMENT:      Your original records were sitting with him in that box?

DONOVAN:         Yes, sir.

GOVERNMENT:      During that time period, you didn't have any expectation or acknowledge that what purported to be original invoices were in your file?

DONOVAN:         No, sir.

GOVERNMENT:      For all you know, sir, and your recollection, under oath, those records could have been placed in your file while you weren't watching.

At that point, White objected and the court held a sidebar conference. White pointed out that he was being accused of a crime. The court stated that the government's "question raises the inference that counsel for the defense planted evidence," to which the government responded: "I am directly making that inference and let me tell you why. I have asked James Monahan yesterday about these invoices. He says they are complete forgeries, and that he never submitted either photocopies or original invoices of this type in this case."

The court expressed its concern that the government's suggestion that White was "in cahoots" with Mata would undermine Mata's right to be represented by an attorney who had not been "impu[g]ned in front of the jury." The government apologized for raising the issue in front of the jury, but the court found that,

7

although the government could bring in evidence establishing that the invoices were forgeries, it had "gone too far" in suggesting that defense counsel was a party to that. The court granted a recess to allow the attorneys to reflect on how to proceed.

When the court reconvened, White moved for a mistrial. He explained he could not proceed because the government had created a conflict of interest and made White a fact witness in the case. The government responded that, although it was sensitive to Mata's right to counsel, the decision whether to grant a mistrial was in the discretion of the court, and it suggested that if the court gave a "curative instruction and admonition to the jury to disregard the question, that would be addressing the improper and prejudicial evidence." The prosecutor acknowledged he asked one too many questions, but stated that "sometimes lawyers get heated in the battle, say things they shouldn't . . . ." Thus, the government "believe[d] [that] this jury can be instructed and can be saved. I would oppose the motion at this time. I would not oppose a motion to strike and instruction for them to disregard that remark." After the court summarized the events leading up to the motion for a mistrial, it asked whether the government would agree to the curative instruction, to which the government responded: "We can live with that." White, however, reiterated that he did not believe a curative instructive would be sufficient under

8

the circumstances. The court ultimately deferred to White's assessment and granted the mistrial.

In coming to this decision, the court stated: "These things happen. Sometimes in the heat of trial people get carried away with something." The court repeated this point twice more in explaining to the jury why a mistrial had been granted. After the jury was excused, the court repeated this point again:

> Let me say this on the record and I mean it sincerely. I think we have two very fine lawyers in this case. This issue, clearly, developed without warning to either lawyer.
>
> . . . .
>
> I want to be clear, I don't think any lawyer set out to do anything impermissible. These are the things that suddenly happen and you look back and say, wait a minute, there is another dimension to this.

Before the second trial commenced, Mata, through a new defense attorney, filed a motion to dismiss the indictment on double jeopardy grounds. Mata argued that the Double Jeopardy Clause barred him from being re-tried after the mistrial because the prosecutor intentionally "goaded" him into moving for a mistrial by suggesting that White planted the invoices.

The court held a hearing on the motion and, after reviewing the trial up to that point, the court stated that the applicable standard was not whether there was an intentional error on the part of the prosecutor, but rather whether any such error

was intended to "provoke a mistrial." The court explained that "the classic situation that one thinks of is where the Government is forced to go to trial and they don't have a witness they would like to have, or the trial turns out to be going badly, not the way they expected . . . ." In this case, however, the court found that, while the prosecutor's line of questioning clearly impaired Mata's right to counsel, "there ha[d] been no showing that this is the type of error that was intentionally undertaken for the purpose of goading Mr. Mata into asking for a mistrial . . . ." In this respect, the court again reiterated that "[t]his was truly a moment when there was a flash point in the trial," and that nobody "wanted a mistrial other than Mr. White and Mr. Mata . . . ." Accordingly, the court denied the motion to dismiss the indictment.

A jury subsequently found Mata guilty on all of the counts in the indictment after nine days of trial, and the court sentenced him to 120 months' imprisonment. This appeal followed.

## II.

"The Double Jeopardy Clause does not bar retrial after the grant of a defendant's motion for mistrial unless the prosecution intentionally goaded the defendant into moving for a mistrial." United States v. Vallejo, 297 F.3d 1154, 1162 (11th Cir. 2002); see United States v. Fern, 155 F.3d 1318, 1324 n.7 (11th

10

Cir. 1998) (noting that the definition of "goad" was "to drive, incite, or rouse") (quotation omitted). "Mere 'overreaching' or 'bad faith' does not implicate double jeopardy unless the prosecutor actually intended to provoke the defendant's motion [for a mistrial]." United States v. Shelley, 405 F.3d 1195, 1200 (11th Cir. 2005). "The inquiry into the prosecution's intent is, for the most part, a matter to be inferred from the objective facts and circumstances." Fern, 155 F.3d at 1324 (citing Oregon v. Kennedy, 456 U.S. 667, 679-80, 102 S.Ct. 2083, 2092, 72 L.Ed.2d 416 (1982) (Powell, J., concurring)). "We review the district court's factual finding for clear error and its application of the law to those facts de novo." Vallejo, 297 F.3d at 1162. "The court's determination of the prosecutor's intent is a finding of fact" that we review for clear error. Id.

### III.

In this case, the district court repeatedly found that the prosecutor's impermissible line of questioning was not intended to provoke a mistrial. The court's finding in this regard is strongly supported by the fact that the prosecutor persistently opposed Mata's motion for a mistrial. See United States v. Jordan, 429 F.3d 1032, 1037 (11th Cir. 2005) (rejecting the defendants' double jeopardy argument because, inter alia, "the prosecutor vigorously argued against" the defendants' motion for a mistrial); Shelley, 405 F.3d at 1201 (concluding that there

11

was nothing in the record to indicate prosecutorial "goading" where the prosecutor, inter alia, "contested the defendant's motion for a mistrial"). Specifically, the government repeatedly argued that instructing the jury to disregard the prosecutor's line of questioning would cure the inference that White had planted the Monahan invoices, and that the court's refusal to grant a mistrial would not constitute an abuse of discretion subject to reversal on appeal. Indeed, it was White who refused to accept a curative instruction and insisted on a mistrial. In this respect, the court subsequently found that nobody "wanted a mistrial other than Mr. White and Mr. Mata . . . ."

Mata argues that the court's findings on this point were clearly erroneous. Mata correctly points out that White's presentation of the Monahan invoices impeached Donovan's earlier testimony that he did not see any substantial documentation establishing that Monahan was a subcontractor. In response, the prosecutor engaged in a line of questioning that was intended to suggest that the invoices were subsequently planted in Donovan's file. Thus, the reason why the prosecutor engaged in this improper line of questioning was to rehabilitate Donovan's credibility, not provoke a mistrial. See Shelley, 405 F.3d at 1201 (concluding that the prosecutor did not intend to provoke a mistrial where an improper line of questioning resulting in a mistrial was designed to undermine a

witness's credibility).

In this respect, and contrary to Mata's assertion, White's successful impeachment of Donovan on the issue of whether there were invoices contained in his file did not significantly damage the government's case. This is so because the government's case did not depend on the complete absence of such invoices, but rather on the allegation that such documents were forged. Thus, even if the Monahan invoices were contained in Donovan's file, this would not have prompted the government to provoke a mistrial.[1] See United States v. Gonzalez, 719 F.3d 1516, 1519 (11th Cir. 1983) ("There was no indication that the trial was going poorly for the government; the prosecutor therefore had no reason to prompt a mistrial."), overruled on other grounds, Staples v. United States, 511 U.S. 600, 619, 114 S.Ct. 1793, 1804, 128 L.Ed.2d 608 (1994)). This is especially true in light of the fact that the mistrial occurred after only two days of trial, before the government put on the bulk of its evidence.[2] See United States v. Posner, 780 F.2d 1536, 1540-41 (11th Cir. 1986) ("If the government attorneys had truly intended to subvert Posner's double jeopardy rights by engineering a 'dry run' as he claims,

---

[1] In response, Mata points out that the government did not call Donovan as a witness at the second trial. However, the government's failure to call Donovan at the second trial confirms that he was not a critical witness for the government and that his impeachment at the first trial would not have prompted the government to provoke a mistrial.

[2] This point is amplified by the fact that the second trial took nine days and involved substantial witness testimony.

13

surely they would have waited longer before pressing the issue.").

Thus, because the prosecutor's suggestion that White planted the invoices was motivated by a desire to rehabilitate Donovan's credibility, rather than by an intent to provoke a mistrial, Mata's remaining arguments – that the prosecutor's line of questioning was pre-planned and that it was so obviously improper that it must have been intended to induce a mistrial – are without merit.

In sum, Mata has not shown that the district court clearly erred by finding that the prosecutor did not intend to provoke a mistrial. Accordingly, we affirm his convictions.

**AFFIRMED.**